TANJA SHERMAN, Petitioner, v. THE HUMAN RIGHTS COMMISSION *et al.*,
Respondents.

Fourth District   No. 4—89—0979

Opinion filed December 6, 1990.

Leahy Law Offices, of Springfield (Mary Lee Leahy and Cheryl Redfield Jansen, of counsel), for petitioner.

Neil F. Hartigan, Attorney General, of Springfield (Robert J. Ruiz, Solicitor General, and Tanya Solov, Assistant Attorney General, of Chicago, of counsel), for respondent Illinois Human Rights Commission.

Samuel C. Patton, of Springfield, for respondent Quincy Country Club.

JUSTICE McCULLOUGH delivered the opinion of the court:

Petitioner Tanja Sherman filed a charge of sex discrimination and sexual harassment against her employer, Quincy Country Club (Club) with the Department of Human Rights (Department). Following the first administrative hearing, the Illinois Human Rights Commission (Commission) adopted the findings of the administrative law judge (ALJ) and issued a decision in favor of petitioner. (*In re Sherman* (1983), 10 Ill. HRC Rep. 381.) On administrative review, this court reversed the Commission because the findings of the ALJ were based on credibility determinations made by a prior ALJ who resigned before a recommended decision was issued. (*Quincy Country Club v. Human Rights Comm'n* (1986), 147 Ill. App. 3d 497, 498 N.E.2d 316.) Following a second administrative hearing, another ALJ issued a recommended decision for petitioner. The Commission reversed the ALJ, finding his decision was contrary to the manifest weight of the evidence and dismissed petitioner's complaint with prejudice. (*In re Sherman* (June 2, 1989), ___ Ill. HRC Rep. ___ (HRC No. 1982SN0437).) Petitioner argues the ALJ's decision was supported by the manifest weight of the evidence and the Commission erred in reversing the ALJ's recommended decision. We affirm the Commission.

PETITIONER'S CASE IN CHIEF

In early November 1981, petitioner interviewed for a job as a bartender at the Club after hearing about a job opening from Terry Bolt,

head bartender or bar manager at the Club. Bolt and petitioner had worked together previously for another employer. According to petitioner, she was interviewed by Bolt and the Club's manager, Jerry Carnivale. Petitioner testified Bolt told her about her job duties and hours, and that he would alternate working every other Sunday in place of petitioner. Petitioner was hired on November 12, 1981, to work in the Carnoustie Room at the Club. Petitioner stated she reported to Bolt, who scheduled petitioner to work Wednesday through Saturday from 11 a.m. to 4 p.m. and every other Sunday. Bolt also (1) told petitioner which party she worked on; and (2) determined which bartender stayed late for the parties. Petitioner stated Bolt told her if she was good, he would give her a raise.

Shortly after she began working for the Club, petitioner became involved in a sexual relationship with Bolt outside of work. In March 1982, petitioner stated she told Bolt she wanted to break off the relationship. Bolt became upset and, according to petitioner, told her he did not want to see anyone else. Petitioner testified Bolt told her if he could not work with her and be with her after work "he would either quit or go crazy, he didn't know which." Petitioner stated she finally terminated the relationship with Bolt on April 6, 1982. However, Bolt continued to ask petitioner out on a daily basis.

Petitioner testified that after April 6, 1982, her job duties and the conditions of her employment changed. Petitioner stated Bolt (1) required her to carry heavy boxes of liquor and glasses up the stairs from the storeroom to the dining-room area; (2) sent her home early from parties when before April 6, 1982, she was the last one to leave; (3) spoke to her in a rude manner and made snide remarks; (4) repeatedly told her she did not know what she was doing; and (5) refused to allow petitioner to take every other Sunday off. Petitioner testified the other bartenders at the Club were males and their duties did not change after April 6, 1982. Petitioner was not reprimanded for her work prior to April 6, nor made aware of any complaints about her work or conduct. Bolt was not involved in a relationship with any other bartenders at the Club while petitioner was employed there.

Petitioner began working at the Brass Tap for additional income in April 1982, while working at the Club. Bolt told petitioner not to tell Carnivale about the second job because Carnivale did not like his employees having a second job. After petitioner told Carnivale about the second job, Carnivale told petitioner it was no problem as long as the Club remained petitioner's priority.

The last day petitioner was scheduled to work was Sunday, May 2, 1982. On that day, petitioner's 15-month-old daughter fell down a

flight of stairs at home. According to petitioner, she called Bolt at the Club on May 2, told him about the accident, and said she did not think she could come in to work. She asked Bolt to tell Carnivale. Carnivale called petitioner back a few minutes later and told her "to get her butt to work." Petitioner told Carnivale she would arrive to work in about 10 minutes. Petitioner stated she was getting ready to take her daughter to the baby-sitter when the Club's hostess, Michelle Gilland, called to tell her Carnivale did not want her to come in that day but the next day, Monday, at 9 a.m. Petitioner did not work on May 2 and came into the Club on Monday, but Carnivale was not there. After leaving a message for Carnivale that she had come in, petitioner left. Petitioner stated Carnivale called her on Tuesday, May 4, 1982, and stated he thought petitioner would be happier at the Brass Tap, "it was more her type of place." Carnivale fired petitioner. Petitioner testified she never received any notice or complaint about her job performance while other employees had received such notices on occasion.

On cross-examination, petitioner stated that while Carnivale was the only person who could hire and fire employees, Bolt told petitioner the day she was to start work. Petitioner admitted she was absent from work six times from November 1981 to May 1982 and tardy 24 times. Petitioner stated Bolt was the one who told her she could leave before the end of her shift. Petitioner stated Carnivale was never around but he would "pop in" every once in a while on his way to the golf course. Petitioner stated she never left her job at the Club early to go to her second job at the Brass Tap. Petitioner also stated (1) no one told her to tie up her hair at work but she tied it up every day voluntarily; (2) she never had any complaints about improperly stocking the bar; (3) she did not read while working; and (4) if she had to leave early, Bolt would cover for her.

Regarding her termination, petitioner stated on cross-examination that on May 2 Carnivale did not tell her that she would be terminated if she did not come in. Petitioner stated when she was fired on May 4, 1982, Carnivale stated her services were no longer needed and he did not mention anything else. Petitioner stated Carnivale was the one who scheduled the work hours for employees and the only duties Bolt performed other than tending bar were the ordering of liquor and preparation of the bar inventory.

On redirect, petitioner stated a male bartender was fired and re-hired within one month while she worked at the Club. Petitioner also testified she was given a cash box with a combination lock to use when working. Petitioner stated she picked up the cash box daily

from the office when her shift started at 11 a.m. She was told to count the money in the box to see that it matched the receipt she signed. Often the amount of money was less than $50 as reflected on the receipt. After bringing the discrepancy to the attention of the office staff, the discrepancy was either corrected or left alone. If there was more than $50 in the box, the office staff would correct the error. Petitioner stated four other bartenders knew the combination to her box and everyone had access to it when she was working. Petitioner stated Bolt told her to leave her cash box under the counter at the bar at the end of her shift and the night bartender would turn the box in at the end of the evening. According to petitioner, Carnivale did not tell her she had to return the cash box to the office at the end of her shift.

Carnivale testified as an adverse witness for petitioner. Carnivale had been the manager of the Club since October 1980. According to Carnivale, Bolt was in charge of ordering supplies and liquor. Carnivale testified he did not know when he hired petitioner that she had worked with Bolt previously. Carnivale was impeached with statements to the contrary he made at the first administrative hearing. Carnivale admitted he had nothing in his records to indicate petitioner's work was not satisfactory. Carnivale brought a problem to an employee's attention if he considered it was serious. He did not recall giving blue slips to tardy employees. He recalled that Randy Riggs, a bartender at the Club, was consistently tardy and he talked to him about his tardiness. Carnivale admitted firing Riggs in November 1981 and rehiring him in January 1982. Carnivale admitted Riggs continued to be tardy after being rehired but also stated Riggs was excellent at his job.

Rhonda Young testified for petitioner that she was employed as a bartender in the Carnoustie Room at the Club in the fall of 1981. Young stated Bolt was the manager and he called her at home one day after he changed the schedule and asked her to come into work. After Young replied she did not want to come into work, Bolt stated if Young did not come into work she would not have a job, "she did not need to go back." Young stated she did not go back and she was fired.

Linda Cosgrove was employed as a waitress for the Club from November 1981 to April 1983. Cosgrove testified for petitioner that she overheard a conversation between Bolt and petitioner wherein Bolt stated, "If I can't see you [petitioner] after work, I can't work with you."

RESPONDENT'S CASE IN CHIEF

James White testified for the Club that he was president of the Club from November 1981 to May 1982. White stated Carnivale was in charge of general supervision of the Club and had the sole authority to hire and fire employees. White stated Carnivale scheduled the hours of all employees. White testified petitioner never complained to him or any other officer about the conditions of her employment. White did not know about petitioner's relationship with Bolt.

Kathy Tournear Libmann testified she was employed in the office of the Club and part of her responsibilities included tending to the cash boxes. Libmann testified it was the responsibility of the bartender to pick up and return the cash box to the office. Libmann stated petitioner's cash box was short $2 to $3 on five occasions and she reported this to Carnivale. Libmann also stated it was policy that employees be on time for work and if an employee was late more than two times, the tardiness was brought to the manager's attention and the employee was talked to about it. Libmann stated there was no question Carnivale had the sole authority to hire and fire employees.

On cross-examination, Libmann stated she made it a practice to report tardy employees to Carnivale, but she did not know how he handled the problem with the employee. Libmann recalled petitioner returned her cash box at the end of her shift during the day. If petitioner's shift ended in the evening, petitioner would lock the cash box in a cabinet upstairs in the Carnoustie Room. Libmann stated she would immediately check the contents of the cash box against the receipt if petitioner waited, but usually petitioner handed in the box and left.

Bolt testified he had no authority to hire and fire employees and no authority over (1) scheduling employees, (2) deciding where employees were posted in the Club, (3) working conditions, (4) change of work hours, or (5) the amount of an employee's pay. He stated he was not present when Carnivale interviewed petitioner for the job in November 1981. Bolt stated Rhonda Young was fired by Carnivale, not by him. Bolt stated he did not talk to petitioner about her job performance or make any overtures to petitioner to better or worsen her employment at the Club. Bolt stated Carnivale told employees how to do their jobs and it was a condition of employment that employees be on time for work. Bolt stated the bartenders picked up their cash box at the beginning of the shift and it was their responsibility to turn the box in and have the contents counted at the end of the shift. Bolt stated the only distinction between his job as head bartender and the other bartenders was that he did the inventory and ordered the li-

quor. Bolt stated he did not believe he was petitioner's boss. Bolt stated petitioner left early a few times and a member complained petitioner was not taking drink orders from customers as she was required to when no waitresses were on duty. Bolt admitted he had a sexual relationship with petitioner, but said it was never connected with work at the Club. Bolt denied ever demanding that petitioner go out with him.

On cross-examination, Bolt stated he did not talk to petitioner on May 2, 1982, the day petitioner's daughter fell down the stairs. Bolt testified he never told Carnivale he was seeing petitioner socially. Bolt stated if petitioner left early, she cleared it with Carnivale first. Bolt denied petitioner broke off their relationship in March or April 1982.

On redirect, Bolt stated he would cover for any of the bartenders as needed, not just for petitioner. Bolt denied (1) treating petitioner differently after April 6, 1982; (2) influencing Carnivale about other employees; and (3) stating to petitioner "if I can't be with you after work, I can't work with you."

Virginia Benjamin testified she was employed as a waitress for the Club. She stated she had problems with petitioner (1) not having her bar stocked for the lunch crowds; (2) not being at her station when needed; (3) not taking table orders for drinks; and (4) not having her hair tied back at work. Benjamin did not complain to Carnivale about petitioner's job performance. Benjamin was aware of petitioner's relationship with Bolt and often found petitioner near Bolt's work area when she should have been working in the Carnoustie Room.

Randy Riggs testified he was fired from his bartender position with the Club by Carnivale for one month between November 1981 and May 1982 because of a misunderstanding about a shortage in his cash box. Riggs was rehired by Carnivale after the cash problem was resolved. On cross-examination, Riggs admitted he was tardy many times before and after he was rehired by Carnivale. Riggs stated Carnivale told him the cash shortage was a mistake and Carnivale wanted him to come back to work.

Carnivale testified he fired Rhonda Young because she would not come in to work when told to. Carnivale stated Bolt had nothing to do with Young's termination. Carnivale stated he interviewed petitioner alone for the job and told her himself about her job duties, including the established procedure for handling the cash box. Carnivale stated he alone prepared the work schedule weekly for all employees and posted it on the employees' bulletin board. Carnivale stated each employee was hired for a six-month probationary period.

Carnivale noticed petitioner's work performance diminished after January 1982. When petitioner left early without his permission, Carnivale had to get someone to cover the bar in the Carnoustie Room until the night-shift bartender came in at 4 p.m. Carnivale recalled firing a male bartender who worked with petitioner for not doing his job. Carnivale stated petitioner did not tie up her hair on the job and he found her reading on the job once. Carnivale admitted there were shortages in petitioner's cash box but did not ask her to repay them. Because petitioner frequently came in late to work, she did not always have the bar properly set up for customers. When petitioner was absent from her station, the hostess, Michelle Gilland, would cover for her.

Carnivale recalled the chef complained that petitioner was often in the kitchen when they were busy. While Carnivale was aware of petitioner's tardiness, he did not keep a record of her tardiness. Carnivale testified he fired petitioner in May 1982 after she said she would come in to work and she did not come in. Carnivale also recalled petitioner left her station before the customers were ready to leave the Club. Carnivale stated he fired Riggs for the cash shortage and tardiness but rehired him because Riggs said he would pay to make up the shortage. Carnivale recalled firing another female employee who worked for the Club during the same time petitioner did because that employee was not performing the job properly. Carnivale stated the first time he learned of the relationship between Bolt and petitioner was at the first hearing at the Human Rights Commission in Springfield. Carnivale stated he did not change petitioner's duties after April 6, 1982, and that her second job at the Brass Tap had no bearing on her termination. Carnivale also stated that before May 2, 1982, petitioner did not refuse to come in to work.

On cross-examination, Carnivale stated the Club was open 100 hours a week but he did not work 100 hours. When he was not working, Carnivale put the hostess in charge and Bolt was in charge of the bar. Carnivale denied that all employees knew Bolt was the bar manager. Carnivale was impeached with his statement given at the first administrative hearing in 1984 when he admitted all employees knew Bolt was the bar manager but also knew Bolt had no authority to hire and fire employees. Carnivale also stated (1) petitioner may have told him at the interview that she knew Bolt, and (2) he asked Bolt after the interview if he knew petitioner and whether she was a good worker. Carnivale stated one of the reasons why he hired petitioner was that Bolt told him she was a good worker. Carnivale admitted giving another employee written notice of her tardiness and not giv-

ing petitioner written notice even though she was tardy more than 20 times. Carnivale stated petitioner did not tell him she left her cash box with the night bartender.

REBUTTAL CASE

Petitioner testified her second job had nothing to do with not wanting to date Bolt after March 1982. Petitioner stated she was never told to return her cash box to the office at the end of her shift. Bolt told her to leave it under the cabinet at the bar for the night bartender. Petitioner also stated (1) Michelle Gilland never covered for her at work; (2) she never read at work; (3) Bolt was present at her initial interview; (4) she talked to Bolt first on May 2, 1982, then to Carnivale, and finally to Michelle Gilland; (5) she was never reprimanded by Carnivale; and (6) she never left work early.

Bolt, testifying for petitioner, stated he did not recall saying that petitioner's second job had something to do with not seeing her after March or April 1982.

ALJ'S FINDING AND ORDER

The ALJ concluded petitioner had proved by a preponderance of the evidence that she was discriminated against by the Club because of her sex and her affair with Bolt became a term and condition of her employment.

Regarding the sex discrimination charge, the ALJ found petitioner to be credible. Further, the ALJ found the petitioner established a *prima facie* case that while she was not a perfect employee, her job performance was similar to the performance given by other bartenders who were males and were not terminated by the respondent. The ALJ determined the Club's articulated reasons for firing petitioner—tardiness, leaving work early, cash shortages, refusal to tie up her hair, reading on the job—were merely a pretext for firing petitioner. After noting discrepancies in the testimony between petitioner and Carnivale from the first hearing to the second hearing in regard to the petitioner's job performance, the ALJ found petitioner and her witnesses more credible than Carnivale and Bolt. The ALJ also accepted as true petitioner's claim that she did not refuse to come in to work on May 2, 1982.

Regarding the sexual harassment charge, the ALJ found petitioner to be more credible. The ALJ concluded that Bolt was petitioner's supervisor and Bolt made their sexual relationship a term and condition of petitioner's employment as evidenced by petitioner's termination within one month after the end of the relationship. The ALJ

found the Club's reasons for firing petitioner and the fact that Carnivale was the only one who could fire employees were not credible in the face of petitioner's witnesses and the inconsistencies in the Club's witnesses' testimonies. Specifically, the ALJ found (1) the testimony of Rhonda Young established that Bolt had the authority to fire employees; (2) the evidence that Carnivale supervised the bartenders more closely than waitresses or kitchen staff was not credible given that Carnivale spoke to Bolt more frequently than he spoke to petitioner; (3) Bolt was a supervisor and not only a bartender who ordered supplies based in part on the fact that Carnivale had very limited contact with petitioner and Bolt had authority to allow petitioner to leave early and to make changes in the bartenders' schedules; (4) petitioner's version of events on May 2, 1982, was more credible; and (5) since there was no evidence that petitioner's work performance in the month prior to her termination was worse than her performance in the prior five months, the only reason for petitioner's termination was her termination of the sexual relationship with Bolt.

COMMISSION'S DECISION AND ORDER

The Commission first concluded that the ALJ's finding that petitioner was fired because she refused to continue a sexual relationship with Bolt was against the manifest weight of the evidence. The Commission, accepting the ALJ's determination that petitioner's evidence was more credible, noted petitioner's actual testimony regarding Bolt's response to her decision to end their relationship differed significantly from the ALJ's finding. Petitioner testified that Bolt told her if he could not work with her and be with her after work "he would either quit or go crazy." The ALJ's finding of fact was that Bolt said "if he could not see petitioner, he could not work with her." According to the Commission, from petitioner's own testimony, Bolt's statement cannot be reasonably viewed as a threat because if Bolt had supervisory authority to hire and fire employees, he would not say to an employee that he "would quit or go crazy." Therefore, the ALJ's finding on this fact was against the manifest weight of the evidence.

The Commission also noted the testimony regarding petitioner's second job and Bolt's initial reaction to it (do not tell Carnivale about it, he does not like his employees to have second jobs). The evidence was uncontroverted. According to the Commission, this evidence suggested Bolt was not seeking to get petitioner fired but rather was interested in protecting her job. The Commission considered this evidence highly relevant. Further, the Commission noted the ALJ did

not make any findings of fact regarding this evidence. The Commission concluded this evidence, which concerned events just prior to petitioner's discharge, supported one of the Club's reasons why petitioner was fired. Thus, the ALJ's decision was against the manifest weight of the evidence.

As to whether Bolt or Carnivale fired petitioner, the Commission found that Rhonda Young's testimony, even if credible, did not support the ALJ's finding that Bolt fired Young. Young's testimony established only that (1) Bolt told Young that if she did not come in to work she would be fired; and (2) Young did not go back to work after her conversation with Bolt.

Regarding the events on May 2, 1982, the Commission accepted the weight given by the ALJ to petitioner's testimony regarding these events. Petitioner testified she told Bolt to tell Carnivale she was not coming in. This testimony, according to the Commission, established that Carnivale was in fact more involved on a day-to-day basis with the bar staff than the ALJ's findings would support. Further, petitioner testified Carnivale did call her back within minutes of her call to Bolt, again supporting a finding that Carnivale was in charge of the staff. Additionally, petitioner stated she told Carnivale she would be in in 10 minutes. The Commission also noted that petitioner testified that Carnivale talked about her committments to her second job as being the reason she was being fired. This testimony supported a finding that Carnivale fired petitioner because of her commitments to her second job and not, as the ALJ found, because of her sex.

According to the Commission, the Gilland evidence was presented to show Carnivale's reason for firing petitioner was pretextual. However, because petitioner did not present the testimony of Gilland, who lived outside Illinois, petitioner failed to establish that Carnivale, who clearly fired petitioner on May 4, 1982, was influenced somehow by some third party to fire petitioner after she agreed to come in to work. The evidence was hotly disputed as to whether Carnivale asked Gilland to call petitioner and to tell her to stay home. The Commission concluded petitioner, who had the burden of proof, failed to establish that Carnivale alone was responsible for her termination.

Finally, the evidence failed to establish that other bartenders were directly insubordinate to Carnivale but were not terminated. According to the Commission, firing an employee for insubordination was a legitimate nondiscriminatory reason. Therefore, the Commission rejected the ALJ's recommended decision and order and dismissed petitioner's complaint with prejudice.

ANALYSIS

■ A court reviewing a decision of the Commission must uphold that decision unless it is based on facts which are contrary to the manifest weight of the evidence. (Ill. Rev. Stat. 1987, ch. 68, par. 8—111(A)(2); *Habinka v. Human Rights Comm'n* (1989), 192 Ill. App. 3d 343, 371, 548 N.E.2d 702, 719; *Department of Corrections v. Adams* (1986), 146 Ill. App. 3d 173, 180, 496 N.E.2d 1138, 1143.) The court may not reweigh the evidence, determine the credibility of witnesses, or substitute its decision for that of the Commission. *Adams*, 146 Ill. App. 3d at 180, 496 N.E.2d at 1143.

■ ■ Section 8—107(E)(2) of the Illinois Human Rights Act (Act) (Ill. Rev. Stat. 1987, ch. 68, par. 8—107(E)(2)) directs that the Commission shall adopt the ALJ's findings of fact unless they are contrary to the manifest weight of the evidence. Where, as here, the Commission rejects some of the ALJ's findings because they are contrary to the manifest weight of the evidence, the function of the court on administrative review is limited to ascertaining whether the Commission's decision, not that of the ALJ, is contrary to the manifest weight of the evidence. (*Habinka*, 192 Ill. App. 3d at 371, 548 N.E.2d at 719-20; *Adams*, 146 Ill. App. 3d at 180, 496 N.E.2d at 1143.) Thus, the reviewing court examines the actual determination of the Commission as if the Commission were the original fact finder. (*Carver Lumber Co. v. Human Rights Comm'n* (1987), 162 Ill. App. 3d 419, 424, 515 N.E.2d 417, 421.) If the record contains any evidence supporting the administrative agency's decision, the decision must be sustained on review. *Quincy School District No. 172 v. Human Rights Comm'n* (1990), 197 Ill. App. 3d 694, 700, 555 N.E.2d 21, 26, quoting *Bultas v. Board of Fire & Police Commissioners* (1988), 171 Ill. App. 3d 189, 194, 524 N.E.2d 1172, 1175.

■ In analyzing employment discrimination claims brought under the Act, the Commission and Illinois courts have adopted the three-part analysis set out in *McDonnell Douglas Corp. v. Green* (1973), 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817. First, plaintiff must establish by a preponderance of the evidence a *prima facie* case of unlawful discrimination. If the plaintiff succeeds in proving the *prima facie* case, the burden shifts to the defendant employer to "articulate, not prove (*Texas Department of Community Affairs v. Burdine* (1981), 450 U.S. 248, 259-60, 67 L. Ed. 2d 207, 219, 101 S. Ct. 1089, 1097), a legitimate nondiscriminatory reason for its decision." (*Zaderaka v. Illinois Human Rights Comm'n* (1989), 131 Ill. 2d 172, 179, 545 N.E.2d 684, 687.) If the employer carries its burden of production, the presumption of unlawful discrimination falls and the plaintiff must prove

by a preponderance of the evidence that the employer's articulated reason was not true but a pretext for unlawful discrimination. *Burdine*, 450 U.S. at 253, 67 L. Ed. 2d at 214, 101 S. Ct. at 1093; *Zaderaka*, 131 Ill. 2d at 179, 545 N.E.2d at 687.

Petitioner argues the ALJ's findings of fact that she established (1) a *prima facie* case of sexual discrimination and harassment, and (2) the Club's reasons for firing petitioner were a pretext for discrimination are supported by the evidence and, therefore, the Commission erred in rejecting these findings.

The Club contends the decision of the Commission is correct because petitioner failed to prove that the male bartenders performed their jobs as poorly as she did but were not fired. The Club also argues petitioner failed to prove her sexual relationship with Bolt became a term and condition of her employment. The evidence established (1) the relationship with Bolt was voluntary; (2) it was conducted after work hours, outside the Club; (3) Bolt had no authority to fire petitioner; and (4) Carnivale had no knowledge of the relationship.

The Commission argues its decision was correct because the evidence failed to show that (1) petitioner's discharge was tied to the termination of the sexual relationship between petitioner and Bolt; or (2) petitioner was treated differently than other employees when she was insubordinate on May 2, 1982.

■ As noted, the task of the reviewing court is to determine whether the Commission's decision is supported by the evidence. Courts are not free to look anew at the ALJ's findings and disturb the discretion of the Commission to accept or reject the ALJ's findings and recommendations. (Ill. Rev. Stat. 1987, ch. 68, par. 8–107(E)(1); *Adams*, 146 Ill. App. 3d at 181, 496 N.E.2d at 1144.) Nonetheless, the Commission's order must rest upon competent evidence and be supported by the record. (*Acorn Corrugated Box Co. v. Illinois Human Rights Comm'n* (1989), 181 Ill. App. 3d 122, 136, 536 N.E.2d 932, 941.) Thus, our review of the record will focus on whether the Commission's findings are against the manifest weight of the evidence.

■ In reviewing the ALJ's findings of fact, the Commission accepted the finding that petitioner was a credible witness, but concluded the *inferences drawn* by the ALJ from her testimony were not supported by the evidence. We agree. As to the sexual harassment charge, petitioner's own testimony failed to establish Bolt reacted to petitioner's desire to end the relationship in a manner consistent with one who had authority to fire or dictate the conditions of her employ-

ment. As to Bolt's supervisory position, petitioner failed to present sufficient evidence on this issue. As the Commission noted, Young's testimony established only that Bolt told Young she would lose her job if she did not come in, but not that Bolt fired Young. Further, petitioner's testimony regarding the events of May 2, 1982, suggested strongly that Bolt did not have any authority to fire petitioner.

Petitioner relies heavily on *Lipsey v. Human Rights Comm'n* (1987), 157 Ill. App. 3d 1054, 510 N.E.2d 1226. There, the complainant alleged his employer fired him because of his race. The Commission reversed the ALJ's findings that the complainant's employer terminated the complainant because of his race. The Commission concluded there was no substantial evidence the complainant was discriminated against because of race. On review, the appellate court noted the evidence clearly established complainant, who had a poor job performance record, was terminated for refusing to retract a statement regarding the racial attitudes of his employer. The case before us is easily distinguished from the *Lipsey* case.

Petitioner raises an issue with respect to the weight given by the Commission to the testimony regarding the actions of Michelle Gilland on May 2, 1982. Petitioner argues the Commission afforded this evidence little weight because it constituted hearsay, although no such objection to this testimony was raised before the ALJ. We conclude the Commission gave proper weight to this testimony. The record shows the Commission found Gilland's testimony was only relevant to establish petitioner's state of mind on May 2, 1982. *The evidence did not establish what Carnivale told Gilland.* Evidence establishing that Carnivale talked to Gilland on May 2, 1982, would have been highly relevant to establishing whether Carnivale used petitioner's insubordination on May 2 as a pretext to fire her because she was a female. We find no error in the Commission's reasoning with respect to this testimony.

Petitioner also relies heavily on the following statement Bolt allegedly made to petitioner for her claim of sexual harassment: "If he could not see her, he could not work with her." Petitioner points out that since (1) petitioner admitted the statement was made to her in the first administrative hearing; (2) Linda Cosgrove testified at the second hearing she overheard Bolt make this statement to petitioner; (3) Bolt did not deny making the statement during the first administrative hearing or on the first day of the second administrative hearing; and (4) Bolt denied making the statement on the second day of the second hearing, the ALJ's finding that petitioner and Cosgrove were more credible than Bolt should not have been disturbed by the

388

Commission. We find petitioner's contention that this one statement, if made, conclusively proves sexual harassment by Bolt untenable. The petitioner ignores her direct testimony at the second hearing wherein she testified Bolt told her "he would either quit or go crazy, he didn't know which." The Commission adopted the ALJ's determination that petitioner was a credible witness and concluded that petitioner's own testimony on Bolt's reaction to her decision to end their relationship was strong evidence that Bolt did not hold a supervisory position with respect to petitioner. The Commission did not reweigh the evidence but found the inferences drawn from it by the ALJ were erroneous. We find no error in the Commission's decision.

The Club articulated a legitimate nondiscriminatory reason for firing petitioner—insubordination—and petitioner failed to establish this reason was a pretext for discrimination. Petitioner presented no evidence that other insubordinate male employees were not fired by the Club. We find the Commission's decision is supported by the manifest weight of the evidence and, therefore, affirm that decision.

Affirmed.

SPITZ and STEIGMANN, JJ., concur.