AERO SERVICES INTERNATIONAL, INC., Petitioner, v. THE HUMAN RIGHTS COMMISSION *et al.*, Respondents.

Fourth District No. 4—96—0586

———

Argued April 29, 1997.—Opinion filed August 29, 1997.—Rehearing denied October 1, 1997.

Charles C. Hughes and James E. Peckert, both of Kehart, Shafter, Hughes & Webber, P.C., of Decatur, for petitioner.

Mary Lee Leahy and Cheryl R. Jansen, both of Leahy Law Offices, of Springfield, for respondent James Allen, Jr.

James E. Ryan, Attorney General, of Chicago (Barbara A. Preiner, Solicitor General, and Janon E. Fabiano, Assistant Attorney General, of counsel), for respondent Human Rights Commission.

JUSTICE GARMAN delivered the opinion of the court:

Complainant James Allen, Jr. (Allen), filed a charge of racial discrimination with the Illinois Department of Human Rights (Department), alleging that respondent Aero Services International, Inc. (Aero Services), had unlawfully terminated his employment. The Department filed a complaint on Allen's behalf with respondent Human Rights Commission (Commission). Ultimately, the Commission affirmed the decision of an administrative law judge (ALJ) finding that Aero Services' stated reasons for discharging Allen were pretex-

tual and not worthy of belief. Allen was awarded a total of $37,650.80 in damages, attorney fees, and costs. *In re Allen*, Ill. Hum. Rts. Comm'n Rep. 1987SF0157 (June 26, 1996). Aero Services now appeals this decision. For the reasons that follow, we vacate the Commission's decision and remand with directions.

Allen filed a charge of discrimination, alleging he was discharged on August 17, 1986. His supervisor, Bob Wills, was a white man. Allen alleged that Aero Services stated the reason for discharging him was that he had taken too many days off work. He believed he had been discriminated against because he is black, citing the following: (1) in July 1986, he was having headaches and discovered he needed glasses; (2) he asked Wills for a medical leave of absence from July 14 through July 18, 1986, at which time he anticipated receiving his glasses; (3) he did not have the glasses by then because Weisser Optical (Weisser) sent them to the wrong address; (4) when he did not receive the glasses on July 18, 1986, he telephoned Wills and said he would report to work as soon as he received his glasses, although he did not give a specific date; (5) Wills said this was okay; (6) on July 27, 1986, Darwin Helms, the white vice president of operations for Aero Services, telephoned him and told him not to report to work because he had not picked up his glasses on July 24, 1986; (7) his performance was always satisfactory, but the three white employees he supervised resented taking instructions from him; and (8) white employees Scott Newlin, "Typus," and "Daren" had been allowed to take time off to go to other jobs.

On October 24, 1988, the Department filed a complaint alleging a civil rights violation, alleging in pertinent part that (1) at the time of the incidents Allen complained about, Aero Services was an "employer" as defined in section 2—101(B)(1)(a) of the Illinois Human Rights Act (Act) (Ill. Rev. Stat. 1987, ch. 68, par. 2—101(B)(1)(a)) and was subject to the provisions of the Act; (2) Allen was working as a part-time assistant supervisor of freight loaders prior to his discharge; (3) Allen was discharged on August 11, 1986, for the stated reason of poor job performance; (4) this reason was pretextual; and (5) Allen's job performance was not substandard and Aero Services did not discharge similarly situated nonblack coworkers with job performance records analogous to Allen's.

Aero Services filed an answer to the complaint that was organized into separate defenses. In one of the defenses, Aero Services alleged it is not an "employer" as defined in section 2—101(B)(1)(a) of the Act and, therefore, the Commission does not have jurisdiction over it. Another of the defenses contained answers to the specific allegations of the complaint. Among those answers was a denial of the allegation

that Aero Services was an "employer" within the meaning of the Act and a statement that Aero Services discharged Allen for failure to return from a leave of absence and for poor attendance. Allen filed a reply to the first four defenses, denying all of them.

In a prehearing memorandum, the parties stipulated to the following facts: (1) Allen is an adult, black male and falls within a class protected by the Act; (2) Allen was hired by Aero Services on October 19, 1985; (3) Allen was working as an assistant supervisor of freight loaders when his employment was terminated; and (4) on August 11, 1986, Aero Services discharged Allen from his employment. Contested issues of law were identified as (1) whether Aero Services is an employer within the meaning of the Act; (2) whether Aero Services discriminated against Allen on the basis of race when it fired him; and (3) the admissibility of certain documents and testimony.

A hearing was held before ALJ Perry Miller on January 25, 1990. A former coworker of Allen's, Storm Boles, testified on Allen's behalf that Allen was his supervisor at one point. He and Allen worked well together and there were never any misunderstandings between them. He never complained to Aero Services about Allen. He never heard of anyone else who had problems with Allen.

Allen testified that when he first went to work for Aero Services, he was a part-time loader. Aero Services handled freight for United Parcel Service (UPS) at the Decatur airport. Later, he became a full-time employee and worked two three-hour shifts. When he first began work, his supervisor was Jerry Kitchens. Kitchens reported to Harry Becker, who was located in Milwaukee, Wisconsin; Becker reported to Darwin Helms. Helms offered Allen the supervisor's job after Kitchens did not show up for work one day and did not call to say he would not be at work. Before Allen could accept the supervisor's job, Aero Services began interviewing others for the job. Aero Services hired Wills; Helms told Allen that Wills had more of a background in working with people. Allen threatened to quit. Helms persuaded him to stay on and told him he would receive a raise that would make his salary more equivalent to Wills' salary. Allen was made assistant supervisor in March 1986 and received a $1-per-hour raise. As far as Allen knows, no disciplinary action was taken against Kitchens. In fact, this was the second time Kitchens had not shown up for work and, after the second time, Kitchens told Allen that Aero Services offered him a job in Milwaukee.

Allen testified that before going on leave on July 15, 1986, he talked to Wills about it. Allen had been having headaches and taking a lot of aspirin. He asked Wills if he could take some time off until he got glasses, which his physician had told him he needed. Wills said

that would be fine, as Aero Services had hired some extra workers. When Allen's glasses did not come in on July 18, 1986, he called Wills and told him this. He talked to Wills again on July 21 or 22, 1986, and Wills told him he would need a statement that Allen's glasses were still on order. He obtained a statement from Weisser and gave it to Wills. On or about July 24, 1986, Wills called him and told him not to report back to work. Between July 24 and 31, 1986, Wills called him again and said not to report to work, that Helms wanted to talk to him. Allen found out Weisser had sent the notification that his glasses were in to the wrong address. He obtained another statement from Weisser stating that the card was sent to the wrong address. Allen told Helms all this when he arrived in Decatur. Helms told him two workers said Allen had threatened them, which Allen denied. He told Helms there had been a few incidents with Chuck Portwood, another employee, in April 1986 when Portwood was doing something wrong and Allen tried to correct him. Helms called Allen about a week later and told him if he allowed Allen to come back to work, some of the workers said they would quit.

Allen stated that about four other employees, all of whom are white, were allowed time off from work for various reasons, such as to register for college, get married, or go to another job. While Allen worked for Aero Services, the only other black employee, Michelle Coleman, was fired.

On cross-examination, Allen testified that he does not know what Aero Services' policies are with respect to leaves of absence. He admitted his physician did not tell him he could not work without glasses. He does not know of any other employee who requested a medical leave of absence. Allen does not believe any disciplinary action was taken with respect to these other employees who were given time off. Allen rested his case after his testimony.

Harry Becker testified that he worked for Aero Services from March 1985 to July 1989. He was operations manager for the Milwaukee division, which included the Decatur, Illinois, operation. Aero Services had work sites in Milwaukee, Wisconsin, South Bend, Indiana, and Decatur, Illinois. The Decatur operation began in August 1985 and had 8 or 10 employees. He trained the employees himself. He supervised Kitchens directly and was responsible for disciplining Kitchens, although he never did so. Kitchens was counseled after the first time he failed to show up for work. When it happened a second time, he was fired.

Kitchens was not offered another job with Aero Services. When Kitchens was discharged, Becker looked at the background of all the current employees to determine whether they would be qualified to

fill the supervisor's job. He had hired all of them himself and was familiar with their qualifications. He determined that none of them met the requirements for the job. Aero Services wanted someone with better managerial skills than any current employee had. He was not aware that an offer had been made to anyone about the supervisor's job. Becker and Helms worked at the same location and saw each other every day. It was Becker's practice to discuss with Helms management issues relating to the Decatur operation. Helms never made a personnel decision as to the Decatur operation without advising Becker. Allen applied for the supervisor's job, but Becker did not interview him because he felt Allen did not have qualifications for the job. Wills was hired because he had a management background, a good customer service background, prior aviation experience, good communications skills, and good mechanical ability, all of which were qualities Aero Services was looking for in a supervisor. Wills did not have authority to hire or fire people. He was responsible for directing the other employees and ensuring the equipment was working properly. He had authority to grant leaves of absence. The policy on medical leaves of absence required that the employee produce a doctor's statement when he returned to work to ensure he was able to perform the job. Becker knows of no exception made to that policy.

On cross-examination, Becker testified that the medical leave policy was written but not given to employees. Becker never personally told Allen about the policy. Wills would have been aware of the policy. Becker no longer had responsibility for the Decatur operation after June 1986. Helms took over those responsibilities and made the decision to make Allen assistant supervisor. Becker does not recall that Helms told him about this decision. Aero Services had a progressive method of discipline—verbal reprimand, written reprimand, suspension, and, finally, termination. Becker was not involved in terminating Allen's employment.

Wills testified that he was supervisor at Aero Services' Decatur operation from March 1986 to April 1988. He approved a leave of absence for Allen to get his glasses. However, after Allen left, one of the other employees asked for time off and Wills called Helms to tell him this would leave Aero Services short-handed with Allen gone. He tried to call Allen a couple of times to see when he expected to come back to work, but was unable to contact him. Helms told Wills to hire some temporary help until Allen came back to work. When Allen asked for leave, Wills did not tell him about the medical leave policy because he did not know the policy. He called Helms to find out and relayed the information to Allen. Two employees, Chuck

Portwood and Mark Andes, complained to him about Allen. Wills called Helms and told him there was some trouble between two employees and Allen. As supervisor, he granted leaves of absence to other employees. However, Allen was the only employee he granted a medical leave of absence. Wills never disciplined anyone while he was supervisor. He gave Newlin a week off to get married while Allen was still off work. After Allen was discharged as assistant supervisor, his job was not filled.

On cross-examination, Wills testified that many of the employees had other full-time jobs. Their work for Aero Services was only part-time. He recalls giving an employee named "Tyus" time off to accommodate his other job. Both "Tyus" and Newlin were white. Wills never investigated complaints by Portwood and Andes. He had no personal knowledge of any problems between them and Allen. Wills got along well with Allen; he did his job in an acceptable manner.

On redirect examination, Wills stated that when he uses the term "leave" he is referring to taking time off for a couple of days or a week.

The telephonic evidence deposition of Helms was taken for use at the hearing. Helms testified that in 1985 and 1986 he was regional vice president for Aero Services, based in Milwaukee. At the time the Decatur operation originated, there were six to eight employees. All employees except the supervisor were considered part-time. He first met Allen when he went to Decatur after Kitchens failed to show up for work. He made Allen assistant supervisor because he had a good attitude and cooperated. Helms did not offer Allen the position of supervisor. Allen asked for the supervisor position and Helms told him he would consider it. Given what happened with Kitchens, Helms felt Aero Services needed a supervisor and an assistant. He felt Allen did not have enough experience to be supervisor, although he believed Allen would be a good assistant. Wills' background in aviation and in supervising people was important in the decision to hire him. In July 1986, Helms gave Wills permission to hire temporary help because of Allen's leave of absence. Helms received another call from Wills stating that Allen had not returned to work and that Portwood and Andes had complained about Allen. The incidents with Portwood and Andes reportedly took place in June 1986. On July 27 or 28, 1986, Helms called Weisser and was told that Allen's glasses were there and they had been trying to contact him. The woman Helms spoke to said Allen had not tried to contact them himself to her knowledge. During the first week of August 1986, Helms went to Decatur. In a meeting with other employees, it was brought to Helms' attention that Allen had been late for work occasionally. Helms also had a

meeting with Allen, Wills, and some employees. Helms could not recall who was there, but thought employees named "Stormy" and "Chuck" were there. Stormy and Chuck said that Allen had threatened them. Chuck said that Allen had threatened him, stating Allen thought Chuck had thrown a box at him and Allen said if he did it again, he (Allen) would kick Chuck's "ass." In the 20 years Helms worked for Aero Services, he never granted or approved medical leave to an employee of a duration longer than three days without a doctor's note. Helms discharged Allen because he did not give Aero Services a release from his doctor and he was asking for special consideration.

On cross-examination, Helms testified that Allen denied the allegations of misconduct. Helms did not take any further steps to investigate either of the alleged incidents. Helms admitted he was impressed with Allen's work when he spent time in Decatur after Kitchens failed to show up for work and that is why he made Allen assistant supervisor. In July 1986, Aero Services' records show 10 employees at the Decatur site. His decision to create an assistant supervisor position was due to the fact that when Kitchens did not show up for work, there was no management personnel there. Helms identified an employee status form from Allen's personnel file that had "resignation" given as the reason for his departure. Helms signed that form. Allen never told Helms he was resigning. A section called "OTHER" was also checked and the explanation on the form stated that Allen took medical leave and Aero Services was unable to keep the job open. Helms admitted there was nothing on the form regarding Allen's failure to give a doctor's note after three days of leave. In addition, there was nothing on the form about alleged problems with other employees.

Prior to issuing a recommended decision, ALJ Miller resigned her position with the Commission. The parties stipulated that another ALJ could issue a decision based upon the record. A written decision was issued on September 27, 1991, by ALJ Patricia Handlin. She found that Allen had merely requested a leave of absence to obtain glasses, not medical leave. In her conclusions of law; she found that (1) the Commission lacks jurisdiction over Allen and the subject matter of the case; (2) Allen did not meet his burden of establishing that Aero Services is an employer as defined in section 2—101(B)(1)(a) of the Act and, therefore, Allen failed to establish a *prima facie* case of racial discrimination; and (3) Aero Services has failed to articulate a legitimate, nondiscriminatory reason for its actions in discharging Allen.

The decision noted the complaint had alleged that Aero Services

is an employer subject to the Act. Aero Services had both denied that allegation and set forth as an affirmative defense that it is not an "employer" under the Act. ALJ Handlin noted that the issue was not properly litigated at the hearing, with only some evidence on that point. However, the decision found the only evidence in the record establishes that Aero Services had a maximum of 12 employees in Illinois. Whether or not the question is jurisdictional, the definition of "employer" is a threshold element of the civil rights violation as defined by the Act. It is the complainant who must prove that Aero Services is an "employer" in order to recover. The decision also noted that Allen had asked to present additional evidence on this subject, stating he had not presented evidence at the hearing because his counsel believed the burden shifted to Aero Services to prove its affirmative defense once it was pleaded. However, the ALJ noted that Aero Services both denied the allegation and raised it in an affirmative defense. Allen was put on notice by the denial that he must present evidence on the issue. The ALJ thus found in favor of Aero Services and recommended the complaint be dismissed.

Both parties filed exceptions to this recommended decision. The Commission issued its decision on January 20, 1995, in which it reversed (1) the holding in the recommended decision that Allen had failed to present a *prima facie* case and (2) the holding that Aero Services failed to articulate legitimate, nondiscriminatory reasons for Allen's discharge. The Commission concluded that having raised its status as an employer as an affirmative defense, Aero Services shifted the burden of proof to itself, thus relieving Allen of the duty to establish this point in his *prima facie* case. Although Aero Services was not obligated to raise the issue affirmatively, it must be bound by its election to do so and Allen was entitled to wait until Aero Services produced such evidence before attempting to negate it.

As to the matter of Aero Services' articulation of a legitimate, nondiscriminatory reason for discharging Allen, the Commission noted that Illinois law requires the employee to prove a *prima facie* case of discrimination. The burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for discharge. Once the employer does so, the burden is on the employee to show the stated reasons were mere pretexts for unlawful discrimination. The Commission held that Aero Services met this burden with its clear explanations of its action. Since ALJ Handlin did not reach the question of pretext, the Commission remanded the case for findings of fact and conclusions of law as to the issue of pretext. As ALJ Handlin was no longer employed by the Commission, the case was assigned to ALJ Michael Evans.

ALJ Evans issued his decision on March 29, 1995. In his findings of fact, he found (1) Aero Services did not follow its progressive discipline policy in discharging Allen; (2) the policy was followed when Kitchens failed to show up for work or call in; (3) when Wills was hired as supervisor, Allen threatened to quit because he did not get that position; (4) rather than lose Allen, Helms created the position of assistant supervisor and gave it to Allen; (5) Helms signed a company personnel form that said Allen had resigned and gave the reason as "took medical leave—unable to keep job open"; (6) Wills approved Allen's initial leave and an extension of that leave, but Wills was not disciplined in any way; and (7) Allen did not have a physical confrontation with Boles.

ALJ Evans concluded that Allen had proved by a preponderance of the evidence that Aero Services' articulated reasons for his discharge, *i.e.*, Allen's noncompliance with Aero Services' medical leave policy and his confrontations with fellow workers, are pretexts for discrimination on the basis of race. In support of this finding, the ALJ characterized Helms' testimony concerning the meeting with employees and the alleged threats made by Allen as "highly suspect." Helms had difficulty remembering who was at the meeting and had to be prompted to recall what was said. Testimony resulting from such "blatant leading" was of little probative value. The ALJ concluded the meeting did not take place in the way Helms described it. In addition, it did not appear that Allen's alleged problems with other employees was a serious issue until the litigation was under way. The ALJ noted that Aero Services' personnel form that said Allen resigned did not mention any such problems. In addition, Aero Services' answer to the complaint does not mention any worker problems as a reason for the discharge. The ALJ also found there was a delay in dealing with reports of the problems that further indicates Aero Services did not take them seriously at the time. As to the medical leave issue, the ALJ noted that Aero Services' four-step discipline policy was not observed in Allen's case. None of the first three steps was invoked. This stands in contrast to the handling of white supervisor Kitchens. Further, Allen had the approval of his supervisor when he took the leave. Wills was not disciplined for any rules violations and Aero Services failed to explain this discrepancy. The ALJ rejected Aero Services' argument that a lack of racial animus is shown by Helms' promoting Allen to assistant supervisor. The timing of the promotion suggests that Allen's experience was valuable to Aero Services in training Wills but, once Wills had the necessary experience, Allen was no longer indispensable.

Aero Services filed exceptions to the recommended order and, in

an order entered on June 26, 1996, the Commission affirmed the decision, finding it was not against the manifest weight of the evidence. This appeal followed.

■ Although a reviewing court is required to affirm an administrative agency's findings of fact, unless those findings are contrary to the manifest weight of the evidence (*Sherman v. Human Rights Comm'n*, 206 Ill. App. 3d 374, 385, 564 N.E.2d 203, 211 (1990)), a court does not give the same deference to an agency's conclusions of law (*Boaden v. Department of Law Enforcement*, 267 Ill. App. 3d 645, 649, 642 N.E.2d 1330, 1333 (1994)).

In its conclusion that Aero Services, by asserting its affirmative defense, had the burden of proving it was not an "employer" under the Act, the Commission relied primarily upon this court's decision in *Capitol Plumbing & Heating Supply, Inc. v. Van's Plumbing & Heating*, 58 Ill. App. 3d 173, 373 N.E.2d 1089 (1978). There, the supplier of a subcontractor sued to foreclose its mechanic's lien. It failed to join the general contractor as a party defendant. In their answer to the complaint, defendants asserted an affirmative defense that alleged plaintiff failed to join a necessary party. At the conclusion of plaintiff's evidence, the trial court ruled the general contractor was a necessary party and had not been joined. The court entered judgment in favor of defendants. On appeal, this court reversed that ruling. Noting it was an unusual procedure to raise failure to join a necessary party as an affirmative defense, the court held that once defendants raised the defense, they were bound to offer evidence to prove it and plaintiff was not required to rebut the defense in its case in chief. Even though some evidence on the joinder issue was elicited in plaintiff's case, it was still error to enter judgment at the close of plaintiff's evidence, since plaintiff was not required to negate the affirmative defense until it put on its rebuttal evidence. *Capitol Plumbing*, 58 Ill. App. 3d at 175, 373 N.E.2d at 1091.

Another case relied upon by the Commission is *Horner v. Bell*, 336 Ill. App. 581, 84 N.E.2d 672 (1949), in which plaintiff sued the sheriff, alleging wrongful entry and seizure of personal property. The sheriff alleged an affirmative defense in his answer, stating he was lawfully executing a writ issued by the circuit court. Plaintiff called the sheriff as an adverse witness and, when questioned by defense counsel, the sheriff identified the writ and described how it was served. The trial court admitted the writ into evidence over objection of plaintiff's counsel. Upon that court's instruction at the close of plaintiff's evidence, the jury found for the sheriff and plaintiff appealed. The appellate court reversed, finding that the sheriff had the burden of proving he was lawfully serving a writ at the time of the

entry and seizure of property. Defense counsel had the right to question the sheriff only regarding matters covered in plaintiff's direct examination. He should not have been permitted to interject the sheriff's defense into the plaintiff's case. The plaintiff was not obligated to anticipate an affirmative defense, nor was he required to introduce into evidence any facts or documents that are strictly matters of defense. *Horner*, 336 Ill. App. at 588-89, 84 N.E.2d at 675-76.

■ Section 2—101(B)(1)(a) of the Act defines "employer" as any person employing 15 or more employees within Illinois, during 20 or more calendar weeks within the calendar year of or preceding the alleged violation. Ill. Rev. Stat. 1987, ch. 68, par. 2—101(B)(1)(a).

Aero Services argues that because it denied in its answer Allen's allegation that it was an "employer" subject to the Act, any burden of proof it had on its affirmative defense should not accrue until after Allen had proved each element of his case in chief. It argues the evidence at the hearing clearly showed that Aero Services did not have the requisite number of employees for applicability of the Act. ALJ Handlin noted the evidence showed a maximum of 12 employees in Illinois. Aero Services notes that Allén never challenged this finding and further notes that section 8—107(E)(2) of the Act requires the Commission to accept findings of fact made by the ALJ unless they are against the manifest weight of the evidence. Ill. Rev. Stat. 1987, ch. 68, par. 8—107(E)(2). Aero Services argues that where the evidence exists in the record, it is available for all purposes to any party.

Allen believes the *Capitol Plumbing* case is dispositive of this issue and, based upon that case, he did not have to address the question of the number of Aero Services' Illinois employees until Aero Services did so in its case. Allen argues that since Aero Services did not do so, he was under no obligation to establish that Aero Services was subject to the Act, even though the issue of the number of employees was not an appropriate affirmative defense. According to Allen, Aero Services assumed the burden of proof by affirmatively pleading it.

We disagree with both parties as to the proper approach on this issue. The *Capitol* and *Horner* cases may both be distinguished from the present case. In neither case did the defendants deny the allegations that were the subject of their affirmative defenses. They challenged those allegations only through pleading the affirmative defenses. Here, Aero Services both denied that it was an "employer" for purposes of the Act and pleaded an affirmative defense to that effect. Thus, Allen cannot legitimately claim to have been misled by Aero Services into believing he was completely relieved of the burden of

proof on this issue. In addition, Allen had included this allegation in his complaint and may therefore be charged with the knowledge that this was an element on which he had the burden of proof.

■ We now hold that the employer's status as an "employer" within the definition of section 2—101(B)(1)(a) of the Act is an essential element of the cause of action and must be pleaded and proved by the complainant. The complainant must present affirmative evidence establishing that the respondent employer comes within the statutory definition of "employer" and is thus subject to the requirements of the Act. A failure to do so will result in the complaint being subject to a motion to dismiss for failure to establish the Commission's jurisdiction. If the employer does not have the requisite number of employees in Illinois, it is simply not subject to the Act and no failure on the employer's part to plead or prove that it is *not* subject to the Act can be used to grant jurisdiction where it does not lie. Subject-matter jurisdiction includes both the power to hear and decide a class of cases and the power to grant the particular relief requested. *People ex rel. Illinois Department of Human Rights v. Arlington Park Race Track Corp.*, 122 Ill. App. 3d 517, 521, 461 N.E.2d 505, 508 (1984). Where, as here, a tribunal's power to act is dependent upon statutory authority, its jurisdiction is limited by that statute. See *Arlington*, 122 Ill. App. 3d at 521, 461 N.E.2d at 508; *People ex rel. Brzica v. Village of Lake Barrington*, 268 Ill. App. 3d 420, 423, 644 N.E.2d 66, 69 (1994); *In re Chiara C.*, 279 Ill. App. 3d 761, 765, 665 N.E.2d 404, 406 (1996). Here, the Commission was empowered by statute to act only in those cases where the employer met the conditions set forth in the Act, including the requirement that the employer had the requisite number of employees within the time period prescribed. We conclude that since Allen did not establish in his case in chief that Aero Services was an "employer" under the Act, the Commission was thereby deprived of jurisdiction over this case and should have vacated the ALJ's recommended order and dismissed the case.

In light of our disposition of this issue, we need not address Aero Services' remaining contention that the Commission's decision was against the manifest weight of the evidence.

For the reasons stated, the Commission's order of June 26, 1996, is vacated and the cause remanded to the Commission for entry of an order dismissing it.

Vacated and remanded with directions.

McCULLOUGH and COOK, JJ., concur.