LILLIE M. DAVIS, Petitioner, v. THE HUMAN RIGHTS COMMISSION *et al.*, Respondents.

Fourth District   No. 4—92—0546

Argued May 14, 1993.—Opinion filed June 30, 1993.

Joseph C. Honan, of Normal, and George F. Taseff (argued), of Bloomington, for petitioner.

Roland W. Burris, Attorney General, of Springfield (Rosalyn B. Kaplan, Solicitor General, and Brian F. Barov, Assistant Attorney General (argued), of Chicago, of counsel), for respondents.

JUSTICE GREEN delivered the opinion of the court:

On January 23, 1986, petitioner Lillie M. Davis, acting pursuant to section 7—102(A)(1) of the Illinois Human Rights Act (Act) (Ill. Rev. Stat. 1985, ch. 68, par. 7—102(A)(1)), filed a charge with the Department of Human Rights (Department) alleging she was discharged from employment by her employer, Illinois State University (University), because she was black. On April 27, 1988, the Department filed a complaint with the Human Rights Commission (Commission) against the University making the same allegation. After hearing evidence, an administrative law judge (ALJ) entered an order on May 3, 1990, finding that the stated reasons for petitioner's discharge were a pretext and recommending the University be found guilty of racial discrimination. After hearing argument, a three-member panel of the Commission, with one member dissenting, issued an order on February 25, 1992, rejecting the recommendation of the ALJ and dismissing the complaint. (*In re Davis* (Feb. 25, 1992), ____ Ill. Hum. Rights Comm'n Rep. ____ (HRC No. 1986—CF—1435).) Petitioner has taken administrative review to this court. (Ill. Rev. Stat. 1991, ch. 68, par. 8—111(A)(1).) We affirm.

The United States Supreme Court has set forth a three-part analysis involving the allocation of the burden of proof in cases dealing with claims of employment discrimination brought under title VII of the Civil Rights Act of 1964 (42 U.S.C. §2000e *et seq.* (1988)). (*McDonnell Douglas Corp. v. Green* (1973), 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817; *Texas Department of Community Affairs v. Burdine* (1981), 450 U.S. 248, 67 L. Ed. 2d 207, 101 S. Ct. 1089.) This approach was adopted by the Illinois Supreme Court in analyzing claims of employment discrimination brought under the Act. *Zaderaka v. Illinois Human Rights Comm'n* (1989), 131 Ill. 2d 172, 545 N.E.2d 684.

The initial burden of proof is carried by the employee to establish a *prima facie* case of racial discrimination. The necessary facts to establish a *prima facie* case vary depending on the individual factual situations. (*McDonnell Douglas,* 411 U.S. at 802 n.13, 36 L. Ed. 2d at 677 n.13, 93 S. Ct. at 1824 n.13.) Here, the parties do not dispute the Commission's finding that petitioner established a *prima facie* case of racial discrimination. The evidence indicated that Davis was (1) a black female; (2) hired by the University as a learner building service worker in the learner program on October 1, 1984; (3) subsequently certified as a probationary building service worker; (4) allegedly qualified for the position of building service worker; and (5) discharged from her position on August 28, 1985.

If the employee establishes a *prima facie* case, a rebuttable presumption arises that the employer unlawfully discriminated against the employee and the burden then shifts to the employer to articulate some legitimate, nondiscriminatory reason for the employee's discharge. (*McDonnell Douglas,* 411 U.S. at 802, 36 L. Ed. 2d at 678, 93 S. Ct. at 1824.) The employer need not persuade the trier of fact that it was actually motivated by its articulated reasons for discharging the employee, but "must clearly set forth, through the introduction of admissible evidence, the reasons for the [employee's] rejection. \*\*\* If the [employer] carries this burden of production, the presumption raised by the prima facie case is rebutted, and the factual inquiry proceeds to a new level of specificity." *Burdine,* 450 U.S. at 255, 67 L. Ed. 2d at 216, 101 S. Ct. at 1094-95.

Here, the ALJ and the Commission concluded that the University had articulated legitimate, nondiscriminatory reasons for discharging petitioner. Those reasons were (1) poor productivity, and (2) unsatisfactory attendance. *Burdine* clearly indicates that the employer does not have the burden of persuading the trier of fact it was actually motivated by the articulated reasons for the discharge, but that a sufficient showing is made "if the [employer's] evidence raises a genuine issue of fact as to whether it discriminated against the [employee]." (*Burdine,* 450 U.S. at 254-55, 67 L. Ed. 2d at 216, 101 S. Ct. at 1094.) As we will explain, we deem the evidence was sufficient here to meet this standard.

Thus, the issue before the trier of fact was whether, more likely than not, the University's stated reasons for firing petitioner were a pretext for a racially motivated discharge. (*McDonnell Douglas,* 411 U.S. at 805, 36 L. Ed. 2d at 679, 93 S. Ct. at 1826.) "This [issue] merges with [the employee's] ultimate burden of persuading the trier of fact that the employer unlawfully discriminated against

[the employee]. [Citation.] This ultimate burden remains at all times with [the employee]." (*Zaderaka*, 131 Ill. 2d at 179, 545 N.E.2d at 687.) The employee may establish pretext in one of two ways: "[E]ither directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256, 67 L. Ed. 2d at 217, 101 S. Ct. at 1095.

Before we discuss the evidence in this case, we must also discuss the standard of review. As we have mentioned in the past, the Act has an unusual provision with regard to standards of review. (See *Sherman v. Human Rights Comm'n* (1990), 206 Ill. App. 3d 374, 385, 564 N.E.2d 203, 211; *Carver Lumber Co. v. Human Rights Comm'n* (1987), 162 Ill. App. 3d 419, 424, 515 N.E.2d 417, 421.) Section 8A—103(E)(2) of the Act directs that the "Commission shall adopt the hearing officer's findings of fact if they are not contrary to the manifest weight of the evidence." (Ill. Rev. Stat. 1991, ch. 68, par. 8A—103(E)(2).) However, that is of no great significance to us because we are directed to sustain the findings of the Commission unless its findings are contrary to the manifest weight of the evidence. (Ill. Rev. Stat. 1991, ch. 68, par. 8—111(A)(2).) Thus, here where the findings of the two bodies differ, we give deference to the findings of the Commission.

The following facts were undisputed: (1) petitioner, a black female, was hired by the University on October 1, 1984, as a building service worker in the learner program; (2) the learner program is a six-month training program where a new employee is introduced to the campus and the general nature of the work, which is general cleaning and housekeeping; (3) at the end of the learner program, the supervisor determines whether the employee is ready to be certified for a regular position, and if so, the employee must complete a six-month probationary period; (4) while in the learner program, petitioner's training supervisor was Gordon Brady; (5) on March 15, 1985, while in the learner program, Davis received a written form titled "Reasons for Oral Warning," which essentially stated that her attendance was unsatisfactory because she had used "sick leave on 5 occasions in last 3½ months"; and (6) on March 21, 1985, the University issued a written document certifying petitioner as a probationary employee, as recommended on March 6, 1985, by Brady, Charles Gose, petitioner's foreman, and Phil Keefauver, petitioner's supervisor, upon completion of the learner program by petitioner.

The following facts were also undisputed: (1) petitioner worked as a probationary employee under the supervision of Gose until she

was laid off on May 10, 1985; (2) on July 16, 1985, petitioner was called by the University to continue as a probationary employee and was assigned to the 11 p.m. to 7 a.m. shift at the Milner Library under the supervision of Herman Kruse; (3) on August 27, 1985, petitioner received another written form titled "Reasons for Oral Warning," which was prepared by Kruse, and under the category of "Unsatisfactory Performance" Kruse had checked (a) "Poor productivity," (b) "Excessive time on assignments," and (c) "Failure to follow oral instructions," and in addition Kruse wrote the following remarks:

"[Petitioner] is sarcastic & insubordinate at times. She does not listen or follow instructions well. Her attitude needs to improve[.] Quality of work is good but she is slow & needs to do more. Her attendance is not acceptable";

(4) on August 28, 1985, Aubrey McCannell, the superintendent of building services, discharged petitioner; and (5) on September 18, 1985, the University issued petitioner a written "Dismissal Notice During Probationary Period," which stated the reasons for her discharge as follows:

"Failure to demonstrate the ability and the qualifications necessary to furnish satisfactory service. Civil Service Rule 11.7(a). Unsatisfactory work performance: (1) poor productivity; (2) unsatisfactory attendance."

McCannell testified that he decided to terminate petitioner's employment upon the basis of a written "three-month" evaluation of petitioner prepared by Kruse. He admitted that Kruse had petitioner under his supervision for only five weeks and did not know whether Kruse had spoken to Gose, petitioner's former supervisor, prior to making the report. He also stated Kruse had told him he, Kruse, was having difficulty getting petitioner to quicken her pace of work. McCannell also mentioned that Brady had indicated to him that petitioner should either be transferred from where she was working or discharged.

Brady testified that (1) he recommended petitioner become a probationary employee; (2) this did not necessarily mean she was proficient in her work but that she had the ability to go ahead and learn; (3) while employees are in the learning phase of their work, they are not told how fast they should work; (4) emphasis is placed on employees being thorough and completing their work during working hours; (5) he was unaware of petitioner having any problems prior to her layoff; (6) shortly after petitioner started working under Kruse, Kruse talked to Brady about petitioner's "attitudes

and things on the job"; (7) Kruse never mentioned anything to him about discharging petitioner; (8) he denied that Kruse wanted to "get rid" of petitioner because she was a black female; (9) petitioner never complained to him about any remark from Kruse regarding black employees hired through the learner program; and (10) he recommended to McCannell that petitioner be fired because she did not follow instructions.

Brady also testified that (1) he never told petitioner he was recommending a discharge nor did he give her an oral warning; (2) he was aware of petitioner's attitude problems and she had told him this arose because she was a single parent; (3) he considered that petitioner had good reason for her attendance problem so he recommended she be certified as a probationary employee; (4) petitioner had spoken to him about her lack of speed and that her co-workers were becoming displeased with having to help her; and (5) in his opinion, absences of petitioner during her probationary period should not have been considered in the three-month evaluation upon which her dismissal was based, nor should a vacation day or a day when petitioner failed to properly punch the time clock if that clock was, in fact, out of order at that time. The three-month evaluation had indicated that petitioner had six absences during her probation period and subsequent work. In Brady's opinion only one of those days should have been considered, and that one day would not constitute an unsatisfactory attendance record.

Petitioner had testified Kruse had told her that the only reason she was hired was because she was a black female and accused her of feeling that her co-workers were a "bunch of jerks." She also testified that Kruse had told a joke in her presence which was demeaning both as to race and gender. Kruse testified denying all of those charges. Petitioner also stated that the University had a rule that those working together go from floor to floor and quit at the same time. However, on one occasion Kruse instructed another employee to go to the next floor to start work there when petitioner had not completed her work on the floor on which they had been working. When petitioner completed the work and was putting her equipment away, Kruse turned off the lights, which upset her. Apparently she talked to Brady the next day and he then talked to Kruse. Petitioner testified that Kruse questioned her about speaking to Brady and talked harshly to her, indicating she had a "bad attitude." Kruse admitted he had this conversation with petitioner but denied yelling at or being angry with her.

Kruse also testified that (1) he told Brady that petitioner would not listen or follow instructions; (2) he thought petitioner worked too slowly; (3) usually employees learn to work rapidly in two or three weeks; (4) he had spoken to petitioner about his complaints before giving her a warning letter; (4) he had prepared the three-month evaluation letter before he gave her the warning letter; (5) he was instructed to make the evaluation; (6) no one else helped him prepare the evaluation; and (7) he felt petitioner was sarcastic and insubordinate but denied he had a personality problem with her. The record indicates that in making his evaluation, Kruse did not deem petitioner's absences as being unacceptable.

We need not recite the testimony of petitioner in detail because, to the extent that it contradicts that of the other witnesses, the Commission could have disregarded it. As to whether petitioner was able to keep up with the work, a co-worker, Carol Jean Stout, testified she had worked with petitioner and observed that petitioner was not one of the faster workers but that petitioner worked as rapidly as she did. On the other hand, another co-worker, Don Fitzgerald, testified that as time went on petitioner became unhappy with her shift, said she was tired, and steadily lowered the speed of her work.

The Commission could reasonably conclude from the evidence that discussion concerning petitioner's work had been going on from soon after she started working under the supervision of Kruse. However, her discharge took place very rapidly and without opportunity being given to her to correct deficiencies in her work. The evidence indicated that the document upon which Kruse made his evaluation had been amended to make a statement concerning petitioner's absences. Furthermore, the emphasis of the University on the absences of petitioner seems quite spurious in view of the record. The foregoing factors were evidence from which the Commission could have inferred a discriminatory motive on the part of the University (see *Brown v. Trustees of Boston University* (1st Cir. 1989), 891 F.2d 337, 346; *Lowry v. Whitaker Cable Corp.* (W.D. Mo. 1972), 348 F. Supp. 202, 210), but the Commission did not make such an inference.

As we have indicated, the parties agree petitioner made a *prima facie* case. However, McCannell sufficiently articulated as a reason for firing her that her productivity was not good. Despite the emphasis placed by the Commission on petitioner's absences, even if the evidence did not support that ground as a sufficient stated reason for discharge, the evidence in regard to productivity

carried the day in countering the *prima facie* case. The evidence of petitioner's perceived poor attitude and poor productivity also sufficiently supported the determination of the Commission that the University did not discriminate in violation of the Act. That determination was not contrary to the manifest weight of the evidence.

Accordingly, we affirm.

Affirmed.

STEIGMANN, P.J., and COOK, J., concur.