GENE A. IRICK, Petitioner, v. THE HUMAN RIGHTS COMMISSION *et al.*, Respondents.

Fourth District   No. 4—98—0993

Argued September 22, 1999.—Opinion filed March 3, 2000.—Rehearing denied April 11, 2000.

Robert I. Auler (argued), of Auler Law Offices, P.C., of Urbana, for petitioner.

James E. Ryan, Attorney General, of Chicago (Joel D. Bertocchi, Solicitor General, and Paul Racette (argued), Assistant Attorney General, of counsel), for respondents Human Rights Commission and Department of Human Rights.

Gregory H. Andrews (argued), of Wessels & Pautsch, P.C., of St. Charles, for respondent Christie Clinic.

JUSTICE COOK delivered the opinion of the court:

Petitioner, Gene A. Irick, filed a complaint with the Illinois Department of Human Rights alleging that respondent, Christie Clinic (Clinic), had fired him because of his age and sex. The Clinic responded that Irick had been fired because he sexually harassed a student intern. An administrative law judge (ALJ) conducted a public hearing in February 1993. In November 1998, the Illinois Human Rights Commission (Commission) dismissed the complaint with prejudice. Irick appeals. We conclude the Commission's decision is contrary to the manifest weight of the evidence, and we reverse and remand.

## I. FACTS

The ALJ found the following facts.

Petitioner, Gene Irick, born in 1942, was employed as an X-ray

technician by respondent Clinic from April 1, 1967, until his termination on June 18, 1990. Irick worked in the radiology department at the Clinic. Irick's immediate supervisor was Katherine McCarthy.

McCarthy became radiology department administrative coordinator in 1986. The Clinic, through Kenneth Blount, administrative director of the radiology department, in consultation with McCarthy, developed a policy soon after 1986 whereby female X-ray technicians were allowed to perform "male-type" procedures, but male technicians were not allowed to perform "female-type" procedures, such as mammograms.

In 1986, after McCarthy became department administrative coordinator, she had several conversations with Julie Christians, an X-ray technician who worked at the Clinic. McCarthy told Christians that she would "get rid of" Irick if it was the last thing she did, and explained to Christians that Irick was "worthless" at least in part because he could not do mammograms. McCarthy made statements to Christians, such as, it had been so long since Irick had been to school that he did things differently than they did. At the time of Irick's discharge he was the only male X-ray technician of the nine employed by the Clinic and was the only one over the age of 40.

Irick testified that he had not received a job performance evaluation and raise by April 1, 1990, his anniversary date. He asked McCarthy about this in June 1990, and she said that just the younger technicians would get raises. Irick asked the Clinic's personnel director, Melodie Garland, about the situation, and she said she would contact Irick later. On June 18, Garland told Irick to come to her office. When Irick arrived, Richard Knierim, the Clinic's resource development manager, was present, along with Blount and Garland. Knierim told Irick that, as of that moment, Irick's employment at the Clinic was terminated.

At the time of his termination, Irick was not given any facts concerning the allegations against him and was not given an opportunity to respond to the allegations. The reason given for the termination was "inappropriate behavior during his working hours at Christie Clinic."

It developed that on March 26, 1990, Dr. Thomas Wagner, the director of radiologic technology at Parkland College, wrote McCarthy that a Parkland student had made a complaint about Irick. On January 29, 1990, Kathy Smith, a clinical instructor at Parkland, told Wagner that a student had told her that Irick had approached her, touched her on the leg, and made comments of a sexually suggestive nature. The student did not indicate that the incident was serious, but she had been upset by it. Wagner checked with other Parkland students

and discerned that while several "such incidents of a verbal nature" had previously occurred, "they felt that it was in jest."

Wagner met with McCarthy and Smith to discuss the matter on February 6, 1990. Wagner told McCarthy he did not consider this to constitute a "serious matter," but did recommend McCarthy meet with Irick to insure that no such incidents reoccurred in the future.

Knierim placed Garland in charge of an investigation into the Parkland complaint and instructed her to meet with Parkland officials. Garland had previously met with McCarthy and Smith, and on June 7, 1990, met with McCarthy and Sue Martina, the complaining student. At that time, Martina signed the following statement:

> "This is a statement by Susan Martina, made at 2:00 p.m. on June 7, 1990, presented to Katherine McCarthy, Radiology Administrative Coordinator.
>
> [']While standing in front of the counter in the processing area, Mr. Irick said to me, ["]Don't move, I need to get into this drawer.["] Before I could move out of the way, Mr. Irick reached between my legs and opened the drawer. While opening the drawer he brushed the inside of my thigh with his hand and chuckled.[']
>
> At the time of this presentation, Susan related to Katherine McCarthy that there had been other times when Mr. Irick had adjusted her clothing and made inappropriate remarks, but she could not recall the specific dates."

The Clinic was never informed what the "inappropriate remarks" were or what clothing adjustments had been made. Knierim, who had the final word on whether Irick was to be discharged, never spoke with Martina and was not aware of any further information from Martina other than the June 7, 1990, statement. Garland spoke only to McCarthy, who did not consult with anyone in her department about the matter.

It had been the practice in the radiology department to engage in behavior that included the exchange of sexual jokes and utilization of coarse language, all frequently done in the presence of Parkland interns. It was also the practice in the radiology department, among X-ray technicians and Parkland interns, in the course of performing their duties in the congested processing area, to make incidental physical contact with others, including reaching around and through the appendages of fellow workers. McCarthy testified she had never observed any of that, although she was aware that sometimes sexual jokes were made and foul language was utilized in the department. McCarthy had herself participated in sexual jokes and foul language in the past, but she did not apprise Garland of that fact.

Martina's complaint was never discussed with Irick before his termination, and Irick did not learn the name of his accuser until several days after he had been discharged. McCarthy, however, was consulted by Garland, Blount, and Knierim before the decision to terminate was made.

Shortly after discharging Irick, the Clinic hired two female X-ray technicians. The parties stipulated that Irick "made no efforts to mitigate damages, because he did not believe he would be able to do so with this on his record."

On February 11, 1993, the ALJ recommended that Irick's complaint of sex discrimination and of age discrimination be sustained, that the Clinic pay Irick $127,047.40, representing back-pay and front-pay damages, and that the incident be deleted from Irick's personnel records. On October 22, 1993, another ALJ recommended that the Clinic pay Irick's attorney fees of $13,045.50 and costs of $692.88.

Five years later, on November 10, 1998, the Commission rejected the recommended order and decision and dismissed the complaint with prejudice. Only one commissioner signed the decision, noting that it was in accordance with votes cast by the other two commissioners prior to their resignation from the Commission.

The Commission, five years removed from the hearing, recognized that it was not its role to reweigh evidence or make determinations of witness credibility, but that this responsibility was left solely to the ALJ, who had the ability to observe witness demeanor and conduct during the course of the public hearing. The Commission will not disturb the factual findings of a judge unless they are against the manifest weight of the evidence. 775 ILCS 5/8A—103(E)(2) (West 1996).

The Commission found that Irick established a *prima facie* case of sex and age discrimination, but that the Clinic had articulated a legitimate, nondiscriminatory reason for its action and that Irick accordingly had the burden of showing that the articulated reason was a pretext for unlawful discrimination. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802-04, 36 L. Ed. 2d 668, 677-79, 93 S. Ct. 1817, 1824-25 (1973); *Zaderaka v. Illinois Human Rights Comm'n,* 131 Ill. 2d 172, 179, 545 N.E.2d 684, 687 (1989); *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 506-08, 125 L. Ed. 2d 407, 416, 113 S. Ct. 2742, 2747-48 (1993).

The Commission held "there is simply no evidence in this case which indicates that the respondent discharged the complainant for anything other than sexual harassment." The ALJ had found the allegation of sexual harassment was not made in good faith, based on the fact no one ever discussed the allegations with Irick, Irick was never

given an opportunity to respond, and the vagueness of the intern's statement. The Commission held the brevity of the student's statements did not "automatically" cast doubt on their veracity. The Commission noted that the question before it was not whether the student intern was in fact harassed, but whether Knierim had a good-faith belief that Irick engaged in inappropriate sexual behavior with her. In response to the failure to discuss the allegations with Irick, the Commission noted that it had previously held that the word of the victim of sexual harassment is sufficient, if the victim is believable, and that there is no need for corroborating witnesses to establish sexual harassment. The Commission recognized that the failure to allow Irick to respond "is in some sense, unfair," but "there is a big difference between unfair and discriminatory."

The Commission noted that the Clinic conducted a two-month investigation after receiving the results of Parkland's investigation and that it was not the role of the Commission to substitute its business judgment for that of the Clinic. It was reasonable that the Clinic reacted quickly because of fear of liability for sexual harassment and to maintain good relations with Parkland College.

The Commission rejected the ALJ's finding of McCarthy's discriminatory animus toward Irick because the finding was based on only one statement and did not take into consideration the high performance ratings McCarthy continually gave Irick. Although McCarthy was contacted by Garland in the course of the investigation, McCarthy was not the person vested with responsibility to make the decision to terminate Irick. No evidence showed that Garland or Knierim, the persons vested with responsibility, displayed any discriminatory animus whatsoever with regard to Irick.

The Commission distinguished *Warren Achievement Center, Inc. v. Human Rights Comm'n*, 216 Ill. App. 3d 604, 575 N.E.2d 929 (1991), because in *Warren* the complainant demonstrated that the decision maker was biased against him, and that, combined with the lack of investigation, made the reason for discharge unworthy of belief. In *Warren*, the complainant was discharged only three hours after the decision maker learned of the harassment allegations, and virtually no investigation took place. Here the Clinic's investigation spanned nearly two months. "Maybe the investigation was not as fair as it could have been, but there is no evidence that it was not carried out in good faith." Accordingly, the Commission found the decision of the ALJ to be clearly against the manifest weight of the evidence.

## II. ANALYSIS

### A. Standard of Review

In *Davis v. Human Rights Comm'n*, 246 Ill. App. 3d 420, 423, 615

N.E.2d 1376, 1378 (1993), *overruled in other part in Cisco Trucking Co. v. Human Rights Comm'n*, 274 Ill. App. 3d 72, 76, 653 N.E.2d 986, 990 (1995), quoting Ill. Rev. Stat. 1991, ch. 68, par. 8A—103(E)(2), this court discussed what we said was an "unusual provision" with regard to the standard of review, section 8A—103(E)(2) of the Human Rights Act (Act), which directs that the " 'Commission shall adopt the hearing officer's findings of fact if they are not contrary to the manifest weight of the evidence.' " *Cf.* 735 ILCS 5/3—110 (West 1996); *Abrahamson v. Illinois Department of Professional Regulation*, 153 Ill. 2d 76, 88, 606 N.E.2d 1111, 1117 (1992) (general rule in administrative review is that agency findings are entitled to deference, even when they differ from those of the hearing officer, and the agency has not had the opportunity to observe the witnesses). We concluded that section 8A—103(E)(2) was of no great significance to us, because "[i]n any proceeding brought for judicial review, *the Commission's* findings of fact shall be sustained unless the court determines that such findings are contrary to the manifest weight of the evidence." (Emphasis added.) Ill. Rev. Stat. 1991, ch. 68, par. 8—111(A)(2). Accordingly, we concluded that where the findings of the ALJ and the Commission differed, we would give deference to the findings of the Commission.

■ The difficulty with the *Davis* approach is illustrated by the present case. The Commission here did not make findings of fact that differed from those made by the ALJ; rather, the Commission determined that the ALJ's recommended decision was contrary to the manifest weight of the evidence. We should not assume, when the Commission simply rejects the ALJ's recommended decision, that the Commission has thereby made findings of fact that would support its decision. Effective July 18, 1996, the legislature apparently overturned our interpretation in *Davis* by changing section 8—111(A)(2) to require deference to "findings of fact made at the administrative level," in place of *"the Commission's* findings of fact." Pub. Act 89—520, § 5, effective July 18, 1996 (1996 Ill. Laws 2167, 2175). Findings of fact made at the administrative level are those made by the ALJ, except for those which the Commission has found to be contrary to the manifest weight of the evidence. See *Schmeier v. Chicago Park District*, 301 Ill. App. 3d 17, 30, 703 N.E.2d 396, 404 (1998) (Act's treatment of hearing officer findings different from general rule).

Although the ALJ is the fact finder, this court can only review the final decision of the Commission, not the findings and recommendation of the ALJ. *Fitzpatrick v. Human Rights Comm'n*, 267 Ill. App. 3d 386, 391, 642 N.E.2d 486, 491 (1994); *Sherman v. Human Rights Comm'n*, 206 Ill. App. 3d 374, 385, 564 N.E.2d 203, 211 (1990). We must uphold the decision of the Commission unless it is contrary to

the manifest weight of the evidence. *Department of Corrections v. Human Rights Comm'n*, 298 Ill. App. 3d 536, 540, 699 N.E.2d 143, 145 (1998); *Sherman*, 206 Ill. App. 3d at 385, 564 N.E.2d at 211 (a case where the Commission had rejected some of the ALJ's findings because they were contrary to the manifest weight of the evidence). An administrative agency decision is against the manifest weight of the evidence only if the opposite conclusion is clearly evident. If the record contains evidence to support the agency's decision, it should be affirmed. *Abrahamson*, 153 Ill. 2d at 88, 606 N.E.2d at 1117. Nevertheless, the agency is not free to ignore the facts and arbitrarily decide the case. The Commission here did not find any facts to be contrary to the manifest weight of the evidence, nor did it find any facts in addition to those found by the ALJ, with perhaps one exception. We must determine whether the Commission's decision is contrary to the manifest weight of the evidence, based on the facts found by the ALJ.

## B. Pretext

■ Once the employer has articulated a legitimate, nondiscriminatory reason for its decision, the complainant must prove by a preponderance of the evidence that the employer's articulated reason was not its true reason, but was instead a pretext for unlawful discrimination. This merges with plaintiff's ultimate burden of persuading the trier of fact that the employer unlawfully discriminated against plaintiff. *Zaderaka*, 131 Ill. 2d at 179, 545 N.E.2d at 687. Whether an employer's articulated reason is pretextual is a question of fact, and the question before the reviewing court is whether the Commission's finding of no pretext is contrary to the manifest weight of the evidence. *Zaderaka*, 131 Ill. 2d at 180, 545 N.E.2d at 688 (in *Zaderaka*, the Commission adopted the ALJ's recommended finding of no pretext).

Evidence of pretext may be either direct or indirect. *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 256, 67 L. Ed. 2d 207, 217, 101 S. Ct. 1089, 1095 (1981) ("either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence"); *Vidal v. Human Rights Comm'n*, 223 Ill. App. 3d 467, 470, 585 N.E.2d 133, 135 (1991). Pretext may be established by evidence that there was an insufficient investigation into the articulated reason for discharge, petitioner did not receive a hearing regarding his discharge, and petitioner did not receive an opportunity to present evidence or explanation of his version. See *Warren*, 216 Ill. App. 3d at 607, 575 N.E.2d at 931-32. *Warren* held that a decision such as this is better made by a trial judge who hears the evidence and observes the demeanor of the witness and

that the Commission's decision should not be overturned unless contrary to the manifest weight of the evidence. *Warren*, 216 Ill. App. 3d at 607-08, 575 N.E.2d at 932. In *Warren*, as in this case, the trial judge who heard the evidence and observed the demeanor of the witnesses was the ALJ.

■ The Commission's statement that there "is simply no evidence" of pretext is clearly mistaken. All the factors present in *Warren*, where pretext was found (insufficient investigation, lack of a hearing before termination, and no opportunity to present evidence or explanation before termination), were present here. For the most part, the Commission attempts to distinguish *Warren*, not on the issue of pretext, but by the assertion that there was evidence of racial bias there, but insufficient evidence of gender and age bias here. The Commission does assert that the two-month investigation here, "although not as fair as it could have been," was superior to the investigation in *Warren* where virtually no investigation took place, petitioner having been fired three hours after the complaint against him was made. Mere delay in an investigation, however, cannot be equated with thoroughness. Actually, the fact that a two-month investigation was conducted here, in which obvious facts were not discovered, is an indication that the Clinic was not really interested in the facts and that the Clinic was not acting in good faith. It was not necessary to conduct a two-month investigation to produce a half-page statement.

The Commission's argument that the word of a victim is sufficient to prove sexual harassment, and no corroboration is necessary, is illogical. The fact that testimony to be presented at a hearing may be sufficient for a finding of harassment does not mean that the hearing may be dispensed with. The testimony of the intern is comprehensively set out in her June 7, 1990, statement, and that statement does not indicate misconduct that would warrant the termination of a 23-year employee who was performing his job well. Absent any evidence to the contrary, the admittedly unfair hearing conducted in this case requires a determination that the discharge of Irick on the basis of sexual harassment was pretextual.

### C. Age or Sex Discrimination

■ A finding that the employer's proffered reasons were pretextual does not automatically compel judgment for the employee. The employee still must prove that he was fired for a discriminatory reason. "[T]he employee must present sufficient evidence to permit a finding that the employer's proffered reasons masked intentional *** discrimination rather than some other legitimate, though not necessarily commendable, motive." *Christ Hospital & Medical Center v. Hu-*

*man Rights Comm'n*, 293 Ill. App. 3d 105, 111, 687 N.E.2d 1090, 1094 (1997); *Illinois J. Livingston Co. v. Human Rights Comm'n*, 302 Ill. App. 3d 141, 155, 704 N.E.2d 797, 806-07 (1998) (reversing the Commission's decision where no factual findings pointed to discriminatory intent). Of course, the employer's failure to articulate that "legitimate, though not necessarily commendable, motive" is some indication that motive did not exist.

The Commission does not enthusiastically argue that Irick sexually harassed Martina. Instead the Commission suggests other possibilities, that the Clinic "reacted quickly because of fear of liability for sexual harassment" and "wanted to respond quickly to the allegation to maintain good relations with Parkland." That argument is not supported by any finding of fact. The incident with the intern occurred before January 29, 1990, and was brought to the Clinic's attention on March 26, 1990. The Clinic did not take Martina's statement until June 7, 1990, after Irick had complained about his pay raise. The Clinic did not respond quickly to Parkland's allegation. Neither Parkland nor the student considered the incident to be a serious matter, and Parkland asked only that someone speak to Irick about the matter. In most discrimination cases there is no direct evidence, and discrimination must be inferred from the circumstances. In this case, however, there is direct evidence, the testimony of Christians that McCarthy had stated that she would get rid of Irick, that Irick was worthless because he could not do mammograms, and that Irick's knowledge was out-of-date. The Commission complains there was only one statement, but it is unusual to have even one statement, and the Commission can point to no findings of fact supporting its position except the fact that McCarthy continually gave Irick high performance ratings. The high performance ratings may be considered a finding of fact made by the Commission in addition to the findings made by the ALJ. The fact that McCarthy gave Irick high performance ratings, however, is little support for the proposition that McCarthy did not discriminate against Irick on the basis of age and sex.

Finally, the Commission asserts that even if Irick's immediate supervisor, McCarthy, was prejudiced against him on account of his sex and age, no evidence showed that Garland or Knierim, the decision makers, displayed any discriminatory animus toward him. The Commission's argument that there was some sort of "Chinese Wall" between McCarthy on one hand, and Knierim and Garland on the other, is clearly wrong. McCarthy was Irick's immediate superior and was consulted by Garland, Blount, and Knierim before the decision to terminate was made. Parkland first reported the incident to McCarthy. Knierim placed Garland in charge of the investigation, but it appears

that McCarthy was involved in all stages of that investigation, meeting with Garland and Parkland officials on February 6, 1990, and then with Garland and Martina when Martina's statement was taken on June 7, 1990. Garland's information about practices in the radiology department came only from McCarthy, not through any investigation of her own. It is clear that McCarthy was privy to the decision-making process of the Clinic.

The Commission contrasts this case to *Warren*, where the complainant "demonstrated that the decision[ ]maker was biased against him based on his race and gender," in addition to its failure to make an adequate investigation. In *Warren*, an African-American employee who had received several promotions "always received favorable evaluations from [his superior] even though he believed she disliked him because he interracially married." *Warren*, 216 Ill. App. 3d at 606, 575 N.E.2d at 930. The Commission held that the employee had "established sufficient inference of the continued bias of [his superior] to the judge's satisfaction." *Warren*, 216 Ill. App. 3d at 607, 575 N.E.2d at 932. The evidence in the present case is much stronger. In *Warren*, there was only the unsubstantiated belief of the petitioner. In the present case, there was direct testimony of statements made by Irick's superior and evidence Irick was excluded from certain duties because of his sex. *Warren* cannot be distinguished on the basis that the evidence of discrimination was much stronger there.

## III. CONCLUSION

There is no dispute that Irick was a member of a protected class, that he was doing his job well enough to meet the employer's legitimate expectations, that despite his performance he was discharged, and that the employer sought a replacement for him. See *Clyde v. Human Rights Comm'n*, 206 Ill. App. 3d 283, 291-92, 564 N.E.2d 265, 269 (1990). The only argument advanced by the Clinic is that Irick was discharged because of his sexual harassment of a student intern. The only findings of fact before us make clear that the student intern was not sexually harassed and that the reason for discharge advanced by the Clinic is pretextual. The Commission's decision that "there was no indication of any sex or age bias in the respondent's decision to terminate," and that the assertion of sexual harassment was not pretextual, is clearly contrary to the manifest weight of the evidence. We reverse the decision of the Commission and remand this case to the

Commission for the purpose of determining damages and attorney fees.

Reversed and remanded.

MYERSCOUGH and KNECHT, JJ., concur.