PINNACLE LIMITED PARTNERSHIP, Petitioner-Appellant, v. THE HUMAN RIGHTS COMMISSION *et al.*, Respondents-Appellees.

Fourth District   No. 4—04—0494

Argued December 8, 2004.—Opinion filed December 20, 2004.

John A. Kauerauf (argued), of Sorling, Northrup, Hanna, Cullen & Cochran, Ltd., of Springfield, for appellant.

Lisa Madigan, Attorney General, of Chicago (Gary S. Feinerman, Solicitor General, and John P. Schmidt (argued), Assistant Attorney General, of counsel), for appellee Human Rights Commission.

Mary Lee Leahy (argued), of Leahy Law Offices, of Springfield, for appellee Jesse Mansker.

JUSTICE STEIGMANN delivered the opinion of the court:

In January 2001, the Illinois Department of Human Rights filed an amended complaint with respondent Illinois Human Rights Commission on behalf of respondent Jesse Mansker. The amended complaint alleged, in pertinent part, that (1) a male coworker had sexually harassed Mansker while both men were employed by petitioner, Pinnacle Limited Partnership, and (2) Pinnacle was liable for the coworker's conduct because it failed to take reasonable correc-

tive measures after Mansker's supervisors became aware of the sexual harassment. Following a February 2002 hearing, an administrative law judge (ALJ) entered an order recommending that the amended complaint against Pinnacle be dismissed with prejudice. In April 2004, the Commission rejected the ALJ's recommendation and determined that Mansker had proved his sexual-harassment claim against Pinnacle.

Pinnacle appeals, arguing that (1) the Commission's decision was against the manifest weight of the evidence and (2) the Commission acted in an arbitrary and capricious manner. We disagree and affirm.

## I. BACKGROUND

In March 1999, Mansker, who is homosexual, filed a discrimination charge with the Department, alleging, in pertinent part, that (1) a coworker, Michael Montgomery, who is also homosexual, had sexually harassed him while both men worked at the Springfield Hilton Hotel, which was operated by Pinnacle; and (2) Mansker had reported the sexual harassment to his supervisors at the Hilton. Following an investigation by the Department, the Director of Human Rights determined that substantial evidence existed that a civil-rights violation had occurred. In February 2000, after the parties' settlement and mediation efforts failed, the Department filed a complaint on Mansker's behalf with the Commission, alleging that (1) Mansker had been subjected to sexual harassment by Montgomery and (2) neither Mansker's immediate supervisor, Abbas Zolghadr, nor Pinnacle properly responded to Montgomery's conduct. (The ALJ later dismissed Zolghadr as a party, and the Commission entered an uncontested finding against Montgomery, who refused to participate in the proceedings. Neither Zolghadr nor Montgomery is a party to this appeal.)

In January 2001, the Department filed an amended complaint on Mansker's behalf with the Commission, alleging, in pertinent part, that (1) from June 1998 through mid-November 1998, Montgomery sexually harassed Mansker while both men were employed by Pinnacle and (2) Pinnacle was liable for Montgomery's conduct because it failed to take reasonable corrective measures after Zolghadr and Lori Smothers, Mansker's assistant manager, became aware of the sexual harassment.

At the February 2002 hearing on the amended complaint before the ALJ, Mansker testified that in May 1998, he began working as a server at the Hilton's restaurant. In June 1998, Montgomery, whom Mansker had previously met at a local bar, first sexually harassed Mansker. On that occasion, Mansker was taking a break with two

female restaurant workers when Montgomery walked up and began talking to them. Montgomery described in detail a sexual encounter he had while on vacation. According to Mansker, Montgomery's description "disgusted" Mansker and the two women. Mansker told Montgomery that they did not want to hear about the encounter, and Montgomery said, "[Y]ou know you want a little strange." Mansker then told Montgomery that he did not want anyone at the Hilton to know that he was homosexual. Montgomery responded by asking Mansker if he would have "a threesome" with Montgomery and someone else. At that point, Mansker and the two women walked away from Montgomery.

After that first incident and until September 1998, every time Mansker saw Montgomery, Montgomery made inappropriate comments. Montgomery "constantly" harassed Mansker by asking Mansker when he was going to go to Montgomery's house for a haircut and a "blow job." On one occasion, Montgomery told Mansker about a sexual encounter he had in a park before coming to work. Montgomery also made comments accusing Mansker's partner of cheating on Mansker. During that time period, Mansker reported Montgomery's conduct to Vicky Boes, the restaurant manager.

Mansker further testified that from September 1998 through mid-December 1998, he worked as a server in Hilton's banquet department. Mansker was supervised by Zolghadr and Smothers. During that time, Montgomery made numerous sexual comments to Mansker. Montgomery continued to make comments about giving Mansker a haircut and a blow job. He also asked Mansker to come to his house "to fuck." In addition, Montgomery told Mansker that he had had sex with Mansker's partner and asked Mansker to join them in a threesome. On several occasions, Mansker discussed Montgomery's conduct with both Zolghadr and Smothers.

Specifically, about one week after Mansker began working as a banquet server, he spoke with Zolghadr and Smothers about Montgomery and "told them what was going on." Mansker told them that he could not handle the things Montgomery was saying to him and he was too upset, sad, and angry to properly serve banquet guests. Zolghadr said that he would talk with Montgomery, and after Mansker left the office, Zolghadr and Smothers talked with Montgomery. Mansker did not know what Zolghadr and Smothers said to Montgomery, but whatever they said to him did not help the situation. On another occasion, Mansker spoke with Zolghadr separately and told him that "it had started again" and Mansker did not want to work with Montgomery.

Mansker also testified that after he told Zolghadr that he did not

want to be scheduled to work banquets with Montgomery, Zolghadr "would always come up to [Mansker] and say, 'have you kissed and made up yet, can I put you back together?' " On one occasion, Zolghadr told Mansker that he thought Mansker and Montgomery "need[ed] to fuck so it's out of [Mansker's] system."

One day in mid-October 1998, Mansker left work early because he was sick. He returned to work two days later with a doctor's note excusing his absence for one of the days. When Mansker handed Zolghadr the note, Zolghadr wadded it up and threw it at Mansker. Zolghadr then told him he was fired. Mansker went to see Anita Perkins, who was the Hilton's personnel coordinator, and told her what had happened. He also told her that he believed that his firing was due to his reporting Montgomery's conduct to Zolghadr. Perkins told Mansker that she would set up a meeting with Zolghadr. On October 20, 1998, Mansker met with Zolghadr and Perkins, and Perkins reinstated Mansker as a banquet server.

On December 13, 1998, Mansker and Montgomery were both working as servers at a banquet. Montgomery once again began making inappropriate comments to Mansker. Mansker reported Montgomery's conduct to Zolghadr and asked if he could go home. Zolghadr told him he could leave early, but Smothers refused to let him leave until around 2 a.m. on December 14. Mansker stated that he was angry that he was not allowed to leave earlier. When Mansker returned to work on December 16, 1998, Zolghadr escorted him to Perkins' office, where Mansker was fired. Later that day, Mansker had a meeting with Perkins and the Hilton's general manager, during which Mansker told the general manager about Montgomery's conduct. Mansker also gave Perkins the names of 10 Hilton employees to interview, but she only interviewed 3 employees.

Mansker acknowledged that he never filed a written complaint with the Hilton's management, as required by the Hilton's harassment policy. Mansker denied telling Zolghadr that Montgomery had called Mansker's probation officer.

Cheryl Davis, Mansker's sister, testified that during the late 1990s, she was a banquet manager at the Springfield Renaissance Hotel. During that time, Montgomery, who worked as a Renaissance banquet server, spoke openly and regularly about his sexual orientation and experiences as a gay man. Montgomery also was very flirtatious with coworkers.

Margaret Allen, a Renaissance banquet captain, testified that Montgomery was "very blatant" about his sexual orientation. He regularly discussed his sexual encounters with other men.

Perkins testified on Pinnacle's behalf that in August 1998, Boes

told Perkins that she wanted Perkins to fire Mansker because of his attitude. Instead, Perkins transferred Mansker to the banquet department. Between September 1998 and December 13, 1998, Perkins met with Mansker about 10 times. Those meetings involved discussions about Mansker's needing time off from work and Zolghadr's refusing to let him leave early. Perkins denied that Mansker ever complained to her about Montgomery's conduct. After Perkins told Mansker that he was fired during the December 16, 1998, meeting, Mansker told her and Zolghadr that Montgomery had harassed him. Following Mansker's meeting with Perkins and the general manager, Perkins investigated Mansker's allegations against Montgomery. Perkins interviewed all of the Hilton employees that Mansker suggested she interview, but she did not find any evidence to support Mansker's allegations. Perkins acknowledged that two male employees, Warren Anderson and Larry Hemingway, reported that Montgomery had made sexually related comments to them. She also acknowledged that another employee told her that he had heard Zolghadr tell Mansker that "you two should be married," referring to Mansker and Montgomery.

Perkins acknowledged that Mansker's absenteeism, anger, and requests not to work with Montgomery could have been signs that Mansker was being sexually harassed.

Zolghadr testified that in late October or early November 1998, Mansker complained to him about Montgomery. Mansker said that he was unhappy because Montgomery had telephoned Mansker's probation officer and told the officer that Mansker was drinking and using drugs. Zolghadr agreed to forego scheduling Mansker and Montgomery to work banquets together. On one occasion, Zolghadr had to schedule Mansker and Montgomery to work the same banquet, but he assigned them to different work stations. Zolghadr talked with Montgomery about Mansker's allegation, and Montgomery denied telephoning Mansker's probation officer. Zolghadr acknowledged that he did not report Mansker's allegation to anyone else.

On the evening of December 13, 1998, Mansker asked Zolghadr if he could leave work early, and Zolghadr told him he could not. Around 9 p.m., Zolghadr went home, and shortly thereafter, Smothers telephoned him and informed him that Mansker was "out of control" and yelling at other managers. Zolghadr told Smothers that Mansker had to stay and work. Around 11:30 p.m., Smothers telephoned Zolghadr again, and Zolghadr informed her that Mansker had to finish his work shift. Based on Mansker's conduct that night and his work history, Zolghadr recommended that he be fired.

Zolghadr also testified that when Perkins fired Mansker, Mansker

told them that he had been sexually harassed and accused Zolghadr of "certain things." Later that day, Zolghadr met with the general manager, who informed Zolghadr that Mansker had accused Zolghadr of telling Mansker to "kiss and make up" with Montgomery. Zolghadr told the general manager that he did not "know anything about that issue."

Smothers testified that between mid-September and late October 1998, Mansker had several unexcused absences from work. Around 9 p.m. on December 13, 1998, Mansker told Smothers that he wanted to leave work early because he had a scheduled appointment the next day. When Smothers told him that he had to stay, Mansker became upset and told her that he "would get even" with her. Mansker continued to complain to Smothers for the rest of his work shift. On December 14, 1998, Smothers prepared a disciplinary report as to the December 13, 1998, incident and gave it to Zolghadr. Smothers stated that (1) Mansker never told her that Montgomery had sexually harassed him and (2) she never saw Montgomery sexually harass Mansker.

In January 2003, the ALJ entered an order recommending that the Department's amended complaint against Pinnacle be dismissed with prejudice. The ALJ found that Montgomery had sexually harassed Mansker, but the evidence did not show that Mansker's supervisors were aware of the harassment or had a reason to be aware of it.

In April 2003, Mansker filed exceptions to the ALJ's recommended order, and Pinnacle later filed a response. In April 2004, the Commission entered an order rejecting the ALJ's recommendation and determining that Mansker had proved his sexual-harassment claim against Pinnacle. The Commission thus entered a finding of liability against Pinnacle. In so doing, the Commission stated, in pertinent part, as follows:

"[Pinnacle] did not take actions to correct the working environment. The question is whether [Pinnacle] failed to act despite notice, or failed to act because it did not have notice.

We find that [Pinnacle] had notice of a sexual harassment and a hostile work environment.

The record indicates that [Montgomery] engaged in extensive inappropriate behavior while at work. [The ALJ] found that [Montgomery] made many sexual remarks to [Mansker] while at work, over a sustained period of time.

[Zolghadr] was supervisory and management personnel. [Pinnacle] is vicariously liable to the extent of Zolghadr's knowledge of the work environment, ([Montgomery's] actions). [Pinnacle] is directly liable for 'hostile environment' sexual harassment to the

extent to which Zolghadr was a participant in that environment ***.

Clearly[,] Zolghadr knew there was a problem between [Montgomery] and [Mansker] well before [Mansker] was discharged. Zolghadr testified that he believed the problem to stem from something other than sexual harassment. As [Pinnacle's] manager, he chose to address the problem through mildly sexual terms: marriage and kissing.

[The ALJ] found that on one occasion[,] Zolghadr told [Mansker] that he and [Montgomery] should 'kiss and make up.' On another[,] he suggested that they should get married. [Pinnacle's] management was aware of tension in the working environment and chose to address the situation in mildly sexual or romantic terms.

Based on those findings, we believe Zolghadr was aware of the hostile environment. We believe he was also active in the perpetuation of a hostile environment.

[The ALJ] did not believe [Mansker's] testimony that[ ] Zolghadr said [Mansker and Montgomery] ['']should go home and have sex.['] We believe [Mansker's] testimony is consistent with Zolghadr's other descriptions of how the dispute between these two subordinate employees should be addressed: kissing and marriage.

The finding that this remark was not made is against the manifest weight of the evidence. On review of the record[,] we find that Zolghadr did make this remark.

The record indicates that [Montgomery] made sexual remarks to other employees. [Perkins] testified and discussed her report on Montgomery's conduct. Her report indicated that [Montgomery] made sexual comments to [Anderson and Hemingway].

Perkins reported that [Anderson, Hemingway, and Mansker] each told her that [Montgomery] had made sexual comments to them. From this[,] she concluded that there was no evidence of sexual harassment.

This report indicates that Montgomery's conduct was pervasive and little investigation was required to find several employees who were aware of [Montgomery's] behavior. It makes Zolghadr's claim of ignorance all the more difficult to believe."

This appeal followed.

## II. ANALYSIS

### A. Pinnacle's Claim That the Commission's Decision Was Against the Manifest Weight of the Evidence

#### 1. *Standard of Review*

Section 8A—103(E)(2) of the Human Rights Act provides that the "Commission shall adopt the hearing officer's findings of fact if they

are not contrary to the manifest weight of the evidence." 775 ILCS 5/8A—103(E)(2) (West 2002). Prior to July 18, 1996, section 8—111(A)(2) of the Act provided that "[i]n any proceeding brought for judicial review [by the appellate court], *the Commission's* findings of fact shall be sustained unless the court determines that such findings are contrary to the manifest weight of the evidence." (Emphasis added.) 775 ILCS 5/8—111(A)(2) (West 1994). As those sections were written, this court did not address section 8A—103(E)(2) and focused only on section 8—111(A)(2). For example, in *Sherman v. Human Rights Comm'n*, 206 Ill. App. 3d 374, 385, 564 N.E.2d 203, 211 (1990), we held that "the reviewing court examines the actual determination of the Commission as if the Commission were the original fact finder." In so holding, we stated, in pertinent part, as follows: "Where, as here, the Commission rejects some of the ALJ's findings because they are contrary to the manifest weight of the evidence, the function of the court on administrative review is limited to ascertaining whether *the Commission's decision*, not that of the ALJ, is contrary to the manifest weight of the evidence." (Emphasis added.) *Sherman*, 206 Ill. App. 3d at 385, 564 N.E.2d at 212. In addition, in *Davis v. Human Rights Comm'n*, 246 Ill. App. 3d 420, 423, 615 N.E.2d 1376, 1378 (1993), we discussed section 8A—103(E)(2), which we referred to as an "unusual provision." We then held that section 8A—103(E)(2) was of no great significance to us because of section 8—111(A)(2), which provided that this court must give deference to the Commission's findings. We further held that when the ALJ's findings and the Commission's findings differ, we would give deference to the Commission's findings. *Davis*, 246 Ill. App. 3d at 423, 615 N.E.2d at 1378-79.

Effective July 18, 1996, the legislature amended section 8—111(A)(2) of the Act by changing the phrase "the Commission's findings of fact" to "findings of fact made at the administrative level." Pub. Act 89—520, § 5, eff. July 18, 1996 (1996 Ill. Laws 2167, 2175). In *Irick v. Human Rights Comm'n*, 311 Ill. App. 3d 929, 935, 726 N.E.2d 167, 172 (2000), this court reasoned that the legislature "apparently overturned our interpretation [of section 8—111(A)(2)] in *Davis*" and held that "[f]indings of fact made at the administrative level are those made by the ALJ, except for those which the Commission has found to be contrary to the manifest weight of the evidence." *Irick*, 311 Ill. App. 3d at 935, 726 N.E.2d at 172. Thus, under *Irick*, if the Commission simply determines that the ALJ's recommended decision was against the manifest weight of the evidence, the appellate court must review the Commission's decision under the manifest-weight standard relying on the ALJ's factual findings.

Based upon our further review of Public Act 89—520, we hold that

the legislature's intent in amending section 8—111(A)(2) of the Act was not to overturn this court's interpretation of that section in *Davis*. In Public Act 89—520, the legislature amended section 7—101.1(A) by adding the following language: "Any final order entered by the [c]hief [l]egal [c]ounsel under this [s]ection is appealable in accordance with paragraph (A)(1) of [s]ection 8—111." Pub. Act 89—520, § 5, eff. July 18, 1996 (1996 Ill. Laws 2167, 2169). (Under section 7—101.1(A) of the Act, the chief legal counsel has jurisdiction to determine requests for review of certain dismissal and default orders.) Reviewing Public Act 89—520 in its entirety, it is clear that the changes in section 8—111 were made to comport with the change to section 7—101.1 regarding direct appellate court appeals from the chief legal counsel's final orders. Thus, replacing the phrase "the Commission's findings of fact" with "findings of fact made at the administrative level" in section 8—111(A)(2) simply expanded the scope of that section to refer to findings of fact made by (1) the Commission in a final order or (2) the chief legal counsel in a final order. The change to section 8—111 was not intended to alter the way in which the appellate court reviews the Commission's decisions.

   ■ Accordingly, consistent with this court's interpretation of section 8—111(A)(2) prior to the 1996 amendment (Pub. Act 89—520, § 5, eff. July 18, 1996) (1996 Ill. Laws 2167, 2175), we do not concern ourselves with the ALJ's findings. Nor do we "pass upon the propriety of the Commission's determination that the findings of the ALJ were contrary to the manifest weight of the evidence." *Habinka v. Human Rights Comm'n*, 192 Ill. App. 3d 343, 371, 548 N.E.2d 702, 719 (1989). Instead, as this court wrote in *Sherman*, 206 Ill. App. 3d at 385, 564 N.E.2d at 211, "the reviewing court examines the actual determination of the Commission as if the Commission were the original fact finder." Our review of the Commission's decision is limited to determining whether it was against the manifest weight of the evidence. *R.R. Donnelley & Sons Co. v. Human Rights Comm'n*, 219 Ill. App. 3d 789, 792, 579 N.E.2d 1144, 1146 (1991). If the record contains any evidence supporting the Commission's decision, we must sustain the decision on review. *Sherman*, 206 Ill. App. 3d at 385, 564 N.E.2d at 211. Further, the appellate court may affirm the Commission's decision on any basis appearing in the record. *Habinka*, 192 Ill. App. 3d at 372, 548 N.E.2d at 720.

## 2. *Analysis*

   Pinnacle argues that the Commission's determination that Pinnacle was liable for the sexual harassment of Mansker was against the manifest weight of the evidence. Specifically, Pinnacle contends that

the evidence was not sufficient to establish that Zolghadr (1) knew that Montgomery sexually harassed Mansker or (2) engaged in harassment of Mansker. We disagree.

■ Section 2—101(E) *of the Act defines "sexual harassment,"* in pertinent part, as follows:

"[A]ny unwelcome sexual advances or requests for sexual favors or any conduct of a sexual nature when *** (3) such conduct has the purpose or effect of substantially interfering with an individual's work performance or creating an intimidating, hostile[,] or offensive working environment." 775 ILCS 5/2—101(E) (West 1998). Section 2—102(D) of the Act provides that an employer is liable for (1) a supervisor's sexual harassment of an employee and (2) a nonsupervisory employee's sexual harassment of an employee "if the employer becomes aware of the conduct and fails to take reasonable corrective measures." 775 ILCS 5/2—102(D) (West 2002). Under this section, a supervisor's sexual harassment is imputed to the employer on the basis that a supervisor is empowered to act on the employer's behalf. See *In re Forbes & Cook County Social Services Department,* Ill. Hum. Rts. Comm'n Rep. 1993CF2987, slip op. at 6 (August 1, 1997) (noting that "managerial and supervisory employees act on behalf of the employer, and in that way[,] there is a certain identity of employer and managerial/supervisory employees"). For the same reason, a supervisor's knowledge that a nonsupervisory employee is sexually harassing another employee should also be imputed to the employer. See *In re Thorne & Department of Veterans' Affairs,* Ill. Hum. Rts. Comm'n Rep. 1995SF0312, slip op. at 16 (June 27, 1997) (in which the Commission determined that the employer was aware of one of its employees' sexual harassment of another employee based on the complaining employee's reporting of the harassment to her supervisors).

■ In this case, the Commission determined that (1) Zolghadr knew about Montgomery's sexual harassment of Mansker and (2) through his comments to Mansker, Zolghadr was "active in the perpetuation of a hostile environment." The evidence showed that (1) Montgomery frequently engaged in inappropriate conduct toward Mansker and other male employees while working at the Hilton, (2) Zolghadr often asked Mansker if he and Montgomery had kissed and made up, (3) Zolghadr once told Mansker that he and Montgomery should be married, and (4) Zolghadr once told Mansker that he and Montgomery "need[ed] to fuck so it's out of [Mansker's] system." This evidence supports the Commission's decision that (1) Zolghadr was aware of the hostile environment created by Montgomery and (2) Zolghadr was an active participant in perpetuating the hostile environ-

ment. Thus, reviewing the Commission's decision under the appropriate standard of review, we conclude that the decision was not against the manifest weight of the evidence.

In so concluding, we reject Pinnacle's claim that the evidence that Zolghadr told Mansker that Mansker and Montgomery should be married should not be considered because it constituted hearsay. When hearsay evidence is admitted without objection, it may be considered and given its natural probative effect. *King v. Ashbrook*, 313 Ill. App. 3d 1040, 1045, 732 N.E.2d 621, 626 (2000). Pinnacle did not object when Perkins testified that during her investigation of Mansker's claims, another employee told her that he had heard Zolghadr tell Mansker that "you two should be married," referring to Mansker and Montgomery. Thus, that evidence is properly before this court, and we may consider it in analyzing the Commission's decision.

We also reject Pinnacle's contention that the Commission's decision was internally inconsistent because the Commission determined that Zolghadr was aware of Montgomery's harassment but did not determine that Smothers and Perkins were aware of the harassment. According to Pinnacle, the Commission "advocates that this case be resolved by finding Mansker's complaints to Zolghadr be deemed credible, but his complaints to Smothers and Perkins be deemed not credible." In this regard, we agree with the Commission that it did not make any determination as to how Zolghadr acquired his knowledge that Montgomery was sexually harassing Mansker. Instead, the Commission determined that Zolghadr's statements containing sexual innuendos with respect to Mansker and Montgomery reflected Zolghadr's knowledge of the sexual harassment. Thus, contrary to Pinnacle's contention, the Commission did not act arbitrarily by crediting only part of Mansker's testimony as to whom he complained about Montgomery's conduct. Further, we note that it was not necessary for the Commission to determine whether Smothers or Perkins was aware of Montgomery's sexual harassment. The Commission's determination that Zolghadr was aware of the harassment was sufficient to render Pinnacle liable because Zolghadr was a hotel supervisor.

## B. Pinnacle's Claim That the Commission Acted in an Arbitrary and Capricious Manner

Last, Pinnacle argues that the Commission acted in an arbitrary and capricious manner when it usurped the ALJ's duties and found that Zolghadr made statements that Zolghadr denied making. In this argument section of its brief, Pinnacle does not identify the complained-of statements. However, from reading the entirety of Pinnacle's brief, it appears that Pinnacle is complaining of the following

statements: (1) that Mansker and Montgomery should go home and have sex, (2) that Mansker and Montgomery "should kiss and make up," and (3) that Mansker and Montgomery "should be married."

As Pinnacle correctly points out, the Commission is not authorized to make its own factual findings and, instead, must adopt the findings of the ALJ unless those findings are against the manifest weight of the evidence. 775 ILCS 5/8A—103(E)(2) (West 2002); *In re Allen & Aero Services International, Inc.*, Ill. Hum. Rts. Comm'n Rep. 1987SF0157, slip op. at 14 (January 20, 1995). Thus, it is not the Commission's role to reweigh the evidence or make witness credibility determinations. *In re Dewberry & Kraft Foods, Inc.*, Ill. Hum. Rts. Comm'n Rep. 1994CF0153, slip op. at 4 (August 29, 2001).

As to the statement that Mansker and Montgomery should go home and have sex, the Commission did not make a factual finding that Zolghadr made that statement. Instead, the Commission determined that the ALJ's finding that Zolghadr did not tell Mansker that he and Montgomery should go home and have sex was against the manifest weight of the evidence. Such a determination is clearly allowed under section 8A—103(E)(2) of the Act (775 ILCS 5/8A—103(E)(2) (West 2002)). We thus reject Pinnacle's contention that the Commission usurped the ALJ's duties by determining "who said what."

As to the statement that Mansker and Montgomery "should kiss and make up," the Commission did not make a factual finding that Zolghadr made that statement. Instead, in accordance with section 8A—103(E)(2) of the Act (775 ILCS 5/8A—103(E)(2) (West 2002)), the Commission indicated that it had adopted the ALJ's finding that Zolghadr made that statement. Pinnacle makes much of the fact that the ALJ actually found that Zolghadr had asked Mansker "whether he and Montgomery had 'kissed and made up.' " According to Pinnacle, asking two homosexual males if they have kissed and made up is more susceptible to an innocent construction than stating that the two men "should" kiss and make up. We are not persuaded. Either statement evinces Zolghadr's (1) knowledge of the sexual nature of the hostility between Mansker and Montgomery and (2) flippant attitude toward the situation, which perpetuated the hostile work environment. Contrary to Pinnacle's contention, the fact that the Commission mistakenly indicated the ALJ found that Zolghadr said "should" as opposed to "had" is not significant and does not suggest that the Commission "largely based its decision on evidence which does not exist."

As to the statement that Mansker and Montgomery "should be married," the Commission did not make a factual finding that Zol-

ghadr made that statement. Instead, the Commission indicated that it had adopted the ALJ's finding that Zolghadr made that statement. However, Pinnacle is correct in stating that the ALJ never made a such a finding. Nonetheless, given that (1) we may affirm the Commission's decision on any basis appearing in the record and (2) we earlier concluded that the Commission's decision was not against the manifest weight of the evidence, we conclude that the Commission's misstatement as to this finding is harmless.

## III. CONCLUSION

For the reasons stated, we affirm the Commission's decision.

Affirmed.

APPLETON and MYERSCOUGH, JJ., concur.