NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2025 IL App (4th) 240352-U

NO. 4-24-0352

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
March 17, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| SAVANNA TEEL, f/k/a Savanna Candor, | ) | Petition for Review of an |
|     Petitioner, | ) | Order of the Human Rights |
|     v. | ) | Commission. |
| THE DEPARTMENT OF CORRECTIONS, THE | ) | |
| ILLINOIS HUMAN RIGHTS COMMISSION, and THE | ) | No. 19-0561 |
| DEPARTMENT OF HUMAN RIGHTS, | ) | |
|     Respondents. | ) | |

JUSTICE DeARMOND delivered the judgment of the court.
Justices Zenoff and Vancil concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The appellate court affirmed, finding the decision of the Illinois Human Rights
Commission was not against the manifest weight of the evidence where petitioner
failed to establish a *prima facie* case of discrimination based on her sex and
pregnancy.

¶ 2    Petitioner, Savanna Teel, filed suit against her employer, the Department of
Corrections (DOC), alleging pregnancy and sex discrimination in employment in violation of the
Illinois Human Rights Act (Act) (775 ILCS 5/1-101 *et seq.* (West 2018)). After a two-day
hearing, an administrative law judge (ALJ) concluded petitioner failed to prove her claim and
recommended her complaint be dismissed. The Illinois Human Rights Commission
(Commission) affirmed and adopted the ALJ's recommended order and dismissed the complaint
with prejudice.

¶ 3    Petitioner then filed a petition for direct administrative review before this court,

contending the Commission erred in declining further review of the ALJ's recommendation because the ALJ "used an incorrect legal framework to analyze this case." Alternatively, petitioner argues the Commission's determination ought to be reversed, as it stands against the manifest weight of the evidence. We affirm.

¶ 4                                    I. BACKGROUND

¶ 5        In March 2020, petitioner filed a six-count amended complaint with the Commission, alleging DOC subjected her to discrimination based on her pregnancy and sex and improperly placed her on unpaid leave of absence in violation of sections 2-102(A), (I), and (J) of the Act (775 ILCS 5/2-102(A), (I), (J) (West 2018)).

¶ 6        Counts I and IV of the amended complaint alleged DOC failed to reasonably accommodate petitioner based on her sex and pregnancy after she requested to have no contact with inmates, even though DOC allowed a male correctional officer to have no inmate contact. Counts II and V alleged DOC "treated similarly situated non-pregnant employees differently under similar circumstances" and placed petitioner on unpaid administrative leave because of her sex and pregnancy. Counts III and VI alleged DOC subjected petitioner to "unequal terms and conditions of employment" due to her sex and pregnancy by allowing a male correctional officer to have no inmate contact but placing petitioner on unpaid administrative leave when she requested a similar accommodation.

¶ 7        In September 2021, the ALJ conducted an evidentiary hearing on petitioner's charge of sex and pregnancy discrimination. Petitioner testified she worked as a correctional officer at Hill Correctional Center (Hill) from June 2014 to May 2018. As a correctional officer, petitioner's duties included escorting inmates, working at the main gate, and "shak[ing] down or search[ing] *** anybody that was coming into the facility." Petitioner explained correctional

officers typically rotated assignments every 90 days, but assignments "could change from day-to-day."

¶ 8        At different times during her pregnancy, petitioner submitted doctor's notes advising she needed to carry a glucometer and refrain from using firearms. She began a 90-day assignment at the main gate to assist with incoming visitors and shakedowns on January 1, 2018, while several months pregnant. Although petitioner stated her duties at that time "did not involve any inmates," she testified another correctional officer at the main gate was expected to escort inmates taking the trash to and from a dumpster outside the prison.

¶ 9        During her assignment to the main gate, petitioner testified an incident occurred involving herself, Sergeant Stickle, Warden Stephanie Dorethy, and Jason Kersh. According to petitioner, on the date of the incident, Kersh called Stickle and spoke with him "regarding why the trash hadn't been taken out that morning." When Kersh asked Stickle to "escort it out," Stickle refused, stating, "it was beneath his pay grade." Kersh then told Stickle to "have [petitioner] do it," but Stickle again refused, telling Kersh, "no way, she's eight months pregnant," and he hung up. About 30 minutes later, Dorethy called Stickle to ask "why [petitioner] could not, or would not, escort the trash out." Stickle again said it was "because [petitioner] was pregnant" and she "was not allowed to do it." Petitioner then spoke with Dorethy over the phone, stating she had never been required to supervise inmates taking out the trash. However, petitioner testified she acquiesced after Dorethy gave her a direct order to do so.

¶ 10        Shortly after the incident with the trash, petitioner spoke with Dorethy again about suitable job assignments. Petitioner denied telling Dorethy she felt unsafe around inmates. She claimed Dorethy "belittled and patronized" her. She also alleged portions of Dorethy's written report following the garbage incident were falsified. Still, petitioner obtained a doctor's

note advising she was to have no direct contact with inmates "since Warden Dorethy was issuing direct orders for [her] to do that." Petitioner then turned the doctor's note in to Kersh, who reassigned her to the armory as the switchboard operator because he "didn't know how to address it." Petitioner testified Tammy Morgan, the human resources representative, and Christopher McLaughlin, the assistant warden of operations, later informed her "Dorethy was not willing to accommodate [her] restrictions of no direct inmate contact and that [she] *** needed to leave work and use [her] sick time until it's exhausted and then go on an unpaid leave of absence until the baby was born or get [her] doctor to drop [her] restrictions."

¶ 11    Dorethy testified she drafted an incident report following the garbage incident, which Dorethy identified as claimant's exhibit No. 4. According to Dorethy's report, on January 29, 2018, she received a call from Stickle asking why petitioner "needed to escort [an] offender to the garbage." Dorethy then asked to speak to petitioner, who told Dorethy "she did not feel safe being around an offender." Dorethy assured petitioner someone in a tower would be watching the inmate taking the garbage to the dumpster and gave petitioner a direct order to escort the inmate to the dumpster.

¶ 12    Dorethy's report indicated she again spoke with petitioner over "her concern with being around offenders." During their conversation, Dorethy asked petitioner "if maybe another post should be considered such as a control unit." Petitioner declined, stating "[she] would have to walk past offenders in order to get to the control." Dorethy "reminded [petitioner] that she *** ha[d] no restrictions other than a weapons restriction." Dorethy also "explained to [petitioner] that if she [did] not feel safe around offenders while she is pregnant then [Dorethy] need[ed] to reevaluate her working in order to avoid being liable for something happening."

¶ 13     Thereafter, petitioner submitted a doctor's note advising she was to have no direct inmate contact. And while other correctional officers, like Anthony Hughes, previously received no-inmate-contact and weapons accommodations after being injured on the job, Dorethy testified petitioner's request was distinct because she "said she was afraid," whereas Hughes made no such indication. So, Dorethy denied petitioner's request because there were no positions available at the time that could accommodate petitioner's restrictions and stated safety concerns and forwarded her response to Morgan. Dorethy explained, "It's a prison. *** It's very hard to keep staff away from offenders." Further, Dorethy testified petitioner's request essentially opened the facility up to other types of liability should petitioner be injured, as Dorethy could not guarantee petitioner complete isolation from inmates while walking to and from her post or performing her duties.

¶ 14     Morgan testified she received all light-duty requests and forwarded them to Dorethy. As warden, it was Dorethy's responsibility to evaluate each request and decide whether it could be accommodated. If approved, Dorethy provided a list of possible placements; if denied, she indicated the request could not be accommodated. In either case, Morgan explained she sent Dorethy's decision "to Springfield to shared services for a final approval." After Dorethy determined petitioner's request could not be accommodated, Morgan forwarded Dorethy's response, along with the original request, to Susan Miller in Springfield.

¶ 15     Miller, a former human resources specialist, testified she "mainly took care of reasonable accommodations, alternative employment program applications, leave of absences," and "[l]ight duty approval or denial." Miller explained there were "usually only a couple reasons" for a denial. Either the warden did not have a position considered light duty with no inmate contact or the position was already filled. According to Miller, "very few spots, if any,"

could accommodate a request like that of petitioner. Assignments to the mailroom, control room, and armory were not considered viable options because correctional officers would inevitably have some level of inmate contact "just to be able to get to those posts." In Miller's experience, accommodating light-duty requests with firearm and no-inmate-contact restrictions was "extremely difficult" because simply "walking into the facility *** [ran] the risk of inmate contact," and correctional officers working in light-duty capacities were still expected to respond during emergencies.

¶ 16    Kersh testified he was a shift supervisor at Hill from April 2015 until his retirement in August 2020. Kersh recalled the trash incident involving petitioner and testified "it was typically the duty of the main gate to escort the trash out to the bin *** and [petitioner] *** was refusing to do that." Likewise, McLaughlin, the assistant warden of operations, testified it was typically "the main gate staff," including the "sergeant or whichever officers are assigned there," who would "run [inmates] out to the dumpster, dump the trash, and then *** come back."

¶ 17    Hughes, a correctional officer at Hill, testified he injured his shoulder while breaking up an altercation between inmates sometime in September 2017. After recovering from his injury for a time, Hughes submitted a doctor's note indicating he could "return to work on light duty," with no inmate contact, which Dorethy initially denied, as she could not assure no inmate contact. Miller and Morgan discussed the situation with Michael Price, DOC's workers' compensation coordinator, who recommended Hughes return to work in the control unit on a light-duty assignment. Dorethy eventually reconsidered her denial and agreed to bring Hughes back to work if Price stated to do so.

¶ 18    When Hughes did eventually return to work, he was assigned to the armory, as it "was the only light duty post that [he] could be on because the tower has weapons and

everywhere else is *** going to have inmate contact." But, despite his assignment to the armory, Hughes testified he "was still in contact with inmates," and he agreed he could not be guaranteed no contact with inmates on any given day in a correctional facility. Hughes explained, "Anything can happen in a prison. You know, you snap your finger a fight could go off, and now you're involved in it."

¶ 19 After the parties submitted posthearing briefs, the ALJ issued a recommendation, finding petitioner failed to establish a case of sex or pregnancy discrimination either directly or indirectly. In doing so, the ALJ did not believe petitioner's "assertion that she did not express a fear of being around inmates." Further, the ALJ noted petitioner's testimony did not "square with the information contained in the *** incident report, where Dorethy indicate[d] that [petitioner] had refused her offer of a new assignment to a control unit because she would encounter inmates going to and from the post." Moreover, the ALJ rejected petitioner's suggestion Dorethy "manufactur[ed] the damaging segment of the report that mentions [petitioner] being fearful around inmates" because it would have required a "grand conspiracy" among Dorethy and staff who signed and dated the document "to fabricate an incident report in order to defeat a potential discrimination claim filed by [petitioner]."

¶ 20 The ALJ also "did not find [petitioner] believable in her assertion that, with respect to her duties at the main gate in the three plus years at the prison facility, she had never escorted an inmate to the dumpster until the day of the January 29, 2018 incident with Dorethy." The ALJ noted Kersh and McLaughlin "stated that escorting an inmate to the garbage dumpster was at least a duty shared by the main gate officers and others at the facility." Additionally, in "[petitioner's] version of the dispute between Stickle and Kersh, Stickle never claimed that the escorting task was not a part of the duties of individuals assigned to the main gate."

¶ 21    Regarding petitioner's purported direct evidence of discrimination, the ALJ observed petitioner "[made] much of Dorethy's testimony, indicating that she had a concern about [petitioner] and her baby, as well as the specter of tort liability, when denying [petitioner's] request for an accommodation." But the ALJ concluded petitioner took Dorethy's testimony "out of context," noting:

> "(1) Dorethy's actions up to and including [petitioner's] placement on an unpaid leave of absence did not reflect any 'maternalistic' attitude toward [petitioner]; and (2) Dorethy's concern was only a reaction in hindsight to an issue injected by [petitioner] herself over whether she could have performed her job as a correctional officer, where [petitioner] told Dorethy of a fear of being around inmates, and, importantly, where Dorethy held the belief that [petitioner] submitted a doctor's note seeking a restriction from an essential duty of [petitioner's] correctional officer position based upon that fear."

¶ 22    Ultimately, the ALJ determined "the record establishe[d] that Dorethy placed [petitioner] on an unpaid leave of absence because: (1) she could not grant [petitioner's] accommodation request of essentially no contact of any kind with an inmate; and (2) there was no other assignment within the prison facility that could accommodate such a request." Thus, the ALJ found "Dorethy's stated concern over either [petitioner's] health or the health of her unborn child *** is not direct evidence of pregnancy discrimination."

¶ 23    The ALJ also found petitioner failed to establish a *prima facie* case of sex or pregnancy discrimination indirectly because she failed to show a similarly situated, nonpregnant employee received more favorable treatment. The ALJ observed petitioner "essentially point[ed] to the favorable treatment given to a male co-worker (Anthony Hughes), who suffered a

workers' compensation injury, and who was allowed to work in a light-duty position that contained a 'no-contact-with-inmates' restriction, as her comparable co-worker." However, the ALJ pointed out the significant differences between petitioner and Hughes. The ALJ noted, "Dorethy initially denied Hughes's request for a [']no-contact-with-inmates' light-duty restriction" and only changed her mind "after getting the input from Price, who stated that no inmate contact requests were granted with the understanding that inmate encounters during ingress/egress to the assigned post were to be disregarded when applying the restriction." Unlike Hughes, petitioner "expressed a fear of being around inmates, even during egress and ingress to an assigned post, that Hughes did not articulate to Dorethy." The ALJ further noted the absence of input from Price regarding Dorethy's decision to deny petitioner's request. Thus, the ALJ found the "record establishes that the catalyst for Dorethy changing her mind and granting Hughes's request *** was based on Price's opinion on the matter" and "the difference in treatment can be explained by the fact that there were different decision-makers at issue with respect to [petitioner's] and Hughes's request for [']no-contact-with-inmates' accommodations."

¶ 24 Petitioner subsequently filed exceptions to the recommended order. However, the Commission declined further review and adopted the ALJ's recommended order and decision as the order of the Commission.

¶ 25 This appeal pursuant to Illinois Supreme Court Rule 335 (eff. July 1, 2017) followed. See 775 ILCS 5/8-111(B) (West 2022) (allowing direct review by the appellate court of final orders of the Commission).

¶ 26 II. ANALYSIS

¶ 27 On appeal, petitioner argues the Commission erred in declining further review of the ALJ's recommendation because the ALJ "used an incorrect legal framework to analyze this

- 9 -

case." Alternatively, petitioner argues the Commission's determination ought to be reversed, as it stands against the manifest weight of the evidence.

¶ 28     We note the parties disagree as to our standard of review. Citing *Reliable Fire Equipment Co. v. Arredondo*, 2011 IL 111871, petitioner argues the appropriate standard of review should be *de novo* because, in her view, the ALJ "outright ignore[d] direct evidence of pregnancy discrimination" and therefore "used an incorrect legal framework to analyze this case." But *Reliable Fire* had nothing to do with review of an administrative agency's decision. Instead, *Reliable Fire* discussed the different standards of review in cases involving restrictive covenants following a bench trial. See *Reliable Fire*, 2011 IL 111871, ¶¶ 12-13. More importantly, the ALJ did not "outright ignore direct evidence of pregnancy discrimination," as petitioner contends. In fact, the ALJ explicitly found the purported "direct evidence" petitioner put forth was not direct evidence of discrimination at all. Petitioner's claim simply boils down to her disagreement with that determination.

¶ 29     That said, even though "the ALJ is the fact finder, this court can only review the final decision of the Commission, not the findings and recommendation of the ALJ." *Irick v. Human Rights Comm'n*, 311 Ill. App. 3d 929, 935 (2000). In the present case, the Commission adopted the ALJ's recommended order and decision as the order of the Commission. "When reviewing decisions from the Commission, the reviewing court examines the actual determination of the Commission as if the Commission were the original fact finder." (Internal quotation marks omitted.) *Champaign-Urbana Public Health District v. Illinois Human Rights Comm'n*, 2022 IL App (4th) 200357, ¶ 181. "[O]ur review of the Commission's decision is limited to determining whether it was against the manifest weight of the evidence." *Sangamon County Sheriff's Department v. Illinois Human Rights Comm'n*, 233 Ill. 2d 125, 142 (2009).

"The court may not reweigh the evidence, determine the credibility of witnesses, or substitute its decision for that of the Commission." *Sherman v. Human Rights Comm'n*, 206 Ill. App. 3d 374, 385 (1990). A finding is against the manifest weight of the evidence if no rational trier of fact could have agreed with the agency's decision (*Wal-Mart Stores, Inc. v. Human Rights Comm'n*, 307 Ill. App. 3d 264, 267 (1999)) or the opposite conclusion is clearly evident (*MIFAB, Inc. v. Illinois Human Rights Comm'n*, 2020 IL App (1st) 181098, ¶ 40). "If the record contains *any* evidence supporting the Commission's decision, we must sustain the decision on review." (Emphasis added and internal quotation marks omitted.) *Champaign-Urbana Public Health District*, 2022 IL App (4th) 200357, ¶ 181.

¶ 30     When analyzing employment discrimination charges brought under the Act, we follow the framework set forth in federal case law relating to federal antidiscrimination statutes. See *Zaderaka v. Illinois Human Rights Comm'n*, 131 Ill. 2d 172, 178 (1989) (stating claims under the Act are to be evaluated in accordance with federal decisions interpreting federal antidiscrimination laws).

¶ 31     Discrimination can be proved through either direct or indirect evidence. *Sola v. Human Rights Comm'n*, 316 Ill. App. 3d 528, 536 (2000). "Direct evidence of discrimination is evidence that, if believed by the trier of fact, would prove discrimination without reliance on inference or presumption." *Board of Education of the City of Chicago v. Cady*, 369 Ill. App. 3d 486, 495 (2006). Under the direct method, "once a plaintiff *** establishes by direct evidence that the employer placed substantial reliance on a prohibited factor, the burden shifts to the employer to prove by a preponderance of the evidence that it would have made the same decision even if the prohibited factor had not been considered." *Lalvani v. Human Rights Comm'n*, 324 Ill. App. 3d 774, 790 (2001).

- 11 -

¶ 32    In support of her direct-evidence claim, petitioner clings to cherry-picked statements given by Dorethy during her testimony at the public hearings, wherein Dorethy mentioned being concerned for petitioner and her pregnancy after petitioner told her she feared being around inmates. However, the Commission pointed out how petitioner took those statements "out of context," noting Dorethy's "concern was only a reaction in hindsight to an issue injected by [petitioner] herself over whether she could have performed her job as a correctional officer" after she "told Dorethy of a fear of being around inmates." In the Commission's opinion, the evidence established Dorethy "placed [petitioner] on an unpaid leave of absence because: (1) she could not grant [petitioner's] accommodation request of essentially no contact of any kind with an inmate; and (2) there was no other assignment within the prison facility that could accommodate such a request," not "because of a concern for [petitioner's] health or the health of her unborn child." Consequently, the Commission determined "Dorethy's stated concern over either [petitioner's] health or the health of her unborn child *** [was] not direct evidence of pregnancy discrimination." The record supports that determination.

¶ 33    While several months pregnant, petitioner began working at the main gate, subject only to her weapons restriction. The duties of correctional officers assigned to the main gate included escorting inmates to and from a dumpster outside the facility periodically. On the day of the garbage incident, Dorethy asked "why [petitioner] could not, or would not, escort the trash out." Dorethy then gave petitioner a direct order to do so and reminded petitioner she had "no restrictions other than a weapons restriction." After petitioner told Dorethy "she did not feel safe" around inmates, Dorethy offered petitioner a position in a control unit away from inmates. But petitioner refused the accommodation "because [she] would have to walk past offenders in order to get to the control [unit]." Dorethy, Hughes, and Miller testified it was virtually

impossible for prison staff to not have some minimal contact with inmates in a prison setting. And it was in this context Dorethy addressed petitioner's accommodation request when petitioner submitted her doctor's note advising she was to have no direct inmate contact. Ultimately, Dorethy testified she was forced to deny petitioner's request because there were no positions available at the time that could accommodate petitioner's restrictions and guarantee petitioner complete isolation from inmates while walking to and from her post and performing her duties.

¶ 34 Accordingly, because the record contains evidence supporting the Commission's decision, we cannot say the Commission's determination petitioner failed to present any evidence of direct discrimination is contrary to the manifest weight of the evidence. See *Champaign-Urbana Public Health District*, 2022 IL App (4th) 200357, ¶ 181; *Irick*, 311 Ill. App. 3d at 935-36.

¶ 35 Alternatively, petitioner argues the Commission's finding she failed to establish a *prima facie* case of pregnancy or sex discrimination stands against the manifest weight of the evidence. To prove discrimination indirectly, Illinois courts follow the three-part test announced in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and adopted by the Illinois Supreme Court in *Zaderaka*, 131 Ill. 2d at 178-79. Pursuant to this three-part test, a "plaintiff must [first] establish by a preponderance of the evidence a *prima facie* case of unlawful discrimination." *Zaderaka*, 131 Ill. 2d at 178-79. Here, the Commission found petitioner failed to establish a *prima facie* case of sex or pregnancy discrimination because, in relevant part, she "failed to present evidence of a similarly-situated, non-pregnant co-worker who received more favorable treatment."

¶ 36          "To establish a *prima facie* case of employment discrimination, the petitioner

must first show that (1) she is a member of a protected class; (2) she was meeting her employer's

legitimate business expectations; (3) she suffered an adverse employment action; and (4) the

employer treated similarly situated employees outside the class more favorably." *Spencer v.*

*Illinois Human Rights Comm'n*, 2021 IL App (1st) 170026, ¶ 34. "The similarly situated

[employee] inquiry is a flexible, common-sense one that asks, at bottom, whether 'there are

enough common factors *** to allow for a meaningful comparison in order to divine whether

intentional discrimination was at play.' " *Henry v. Jones*, 507 F.3d 558, 564 (7th Cir. 2007)

(quoting *Barricks v. Elie Lilly & Co.*, 481 F.3d 556, 560 (7th Cir. 2007)).

> "[I]n the usual case a plaintiff must at least show that the
>
> comparators (1) dealt with the same supervisor, (2) were subject to
>
> the same standards, and (3) engaged in similar conduct without
>
> such differentiating or mitigating circumstances as would
>
> distinguish their conduct or the employer's treatment of them.
>
> [Citation.] This is not a magic formula, however, and the
>
> similarly-situated inquiry should not devolve into a mechanical,
>
> one-to-one mapping between employees." (Internal quotation
>
> marks omitted.) *Lau v. Abbott Laboratories*, 2019 IL App (2d)
>
> 180456, ¶ 46.

"Whether a comparator is similarly situated is usually a question for the fact-finder." (Internal

quotation marks omitted.) *Champaign-Urbana Public Health District*, 2022 IL App (4th)

200357, ¶ 191.

¶ 37          Here, the evidence supports the Commission's finding that Hughes was not a

similarly situated employee, as significant differences existed between Hughes and petitioner. First, Dorethy and Miller testified it was impossible for correctional officers to entirely avoid inmate interactions as part of their duties, and Hughes even testified that, despite his restriction on inmate contact, he "was still in contact with inmates" throughout his light-duty assignment. Further, Hughes testified he understood he could not be guaranteed no contact with inmates on any given day in a correctional facility, and Miller testified correctional officers working in light-duty capacities were still expected to respond during emergencies. But petitioner, unlike Hughes, "expressed a fear of being around inmates, even during egress and ingress to an assigned post." As stated, when petitioner told Dorethy she feared for her safety, Dorethy offered her another assignment to a control unit, but petitioner declined "because [she] would have to walk past offenders in order to get to the control." Hughes, on the other hand, never expressed a fear of inmates and willingly accepted a light-duty assignment, while recognizing unforeseen incidents and some level of contact with inmates could occur at any time. Within the context of each situation, "no contact with inmates" for Hughes was more akin to having no actual interaction, primarily physical, with an inmate. For petitioner, once she expressed a fear of even seeing an inmate on her way to or from her assignment, Dorethy was left to attempt to find an appropriate accommodation that removed her from just seeing an inmate—a tall task, we would imagine, in a prison setting. Petitioner and Hughes were not "similarly situated."

¶ 38 Second, the Commission found "the difference in treatment [could] be explained by the fact that there were different decision-makers at issue with respect to [petitioner's] and Hughes's request for [']no-contact-with-inmates' accommodations." " 'When different decision-makers are involved, two decisions are rarely similarly situated in all relevant respects.' " *Stanback v. Best Diversified Products, Inc.*, 180 F.3d 903, 910 (8th Cir. 1999) (quoting *Harvey v.*

*Anheuser-Busch, Inc.*, 38 F.3d 968, 972 (8th Cir. 1994)). The record showed that after sustaining a job-related injury, "Dorethy initially denied Hughes's request for a [']no-contact-with-inmates' light-duty restriction." However, Price, the workers' compensation coordinator, was the ultimate "catalyst for Dorethy changing her mind and granting Hughes's request." After Price recommended Hughes return to light-duty work, Dorethy eventually assigned him to a post subject to Price's approval. In contrast, petitioner was not returning from workers' compensation leave, and Price, notably, gave no input as to Dorethy's decision to deny petitioner's request.

¶ 39　　　　　Accordingly, the record contains evidence supporting the Commission's determination that Hughes and petitioner were not similarly situated employees. Thus, we cannot say the Commission's finding petitioner failed to establish a *prima facie* case of sex or pregnancy discrimination based on her failure "to present evidence of a similarly-situated, non-pregnant co-worker who received more favorable treatment" was against the manifest weight of the evidence. See *Champaign-Urbana Public Health District*, 2022 IL App (4th) 200357, ¶ 181; *Spencer*, 2021 IL App (1st) 170026, ¶ 34.

¶ 40　　　　　　　　　　　　　III. CONCLUSION

¶ 41　　　　　For all these reasons, we affirm the Commission's order.

¶ 42　　　　　Affirmed.